638 P.2d 689

Forrest C. MacCONNELL, a single
man, Appellant,

v.

Frederick G. MITTEN and Eileen Mitten,
husband and wife, Appellees.

No. 15346.

Supreme Court of Arizona,
In Division.

Nov. 23, 1981.

Rehearing Denied Jan. 6, 1982.

Steven M. Friedman, Phoenix, for appellant.

David S. Shughart, II, Phoenix, for appellees.

CAMERON, Justice.

Plaintiff, Forrest MacConnell, brought an action against defendants Frederick G. Mitten, Eileen Mitten, and other persons who are not part of this appeal, regarding allegedly defamatory statements that were made by Fred Mitten at the time of plaintiff's termination by his employer, the Bureau of Medical Economics. Defendants filed a motion for summary judgment which was granted with directions that the judgment be entered pursuant to Rule 54(b), Arizona Rules of Civil Procedure, 16 A.R.S. Plaintiff appeals the granting of the motion for summary judgment. We have jurisdiction of this appeal pursuant to A.R.S. § 12–2101(B) and Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

We must answer the following questions on appeal:

1. Were the statements made by Fred Mitten to his son regarding Forrest MacConnell defamatory and actionable?

2. Did the remarks of Fred Mitten regarding the reason for MacConnell's termination injure plaintiff in his business or profession?

3. Do genuine issues of material fact remain that would preclude the grant of summary judgment to defendants Frederick G. Mitten and Eileen Mitten?

The facts necessary to a determination of this appeal, and viewed in a light most favorable to MacConnell, the party against whom the motion for summary judgment was granted, *Mobile Home Estates, Inc. v. Levitt Mobile Homes Systems, Inc.,* 118 Ariz. 219, 575 P.2d 1245 (1978), are as follows. Frederick Mitten was the Executive Secretary of the Maricopa County Medical Society for 25 years until his retirement in 1976. At that time, his son, Anthony Mitten, assumed his duties as chief administrative officer of the Maricopa County Medical Society and its affiliated collection agency, the Bureau of Medical Economics. Both had worked closely with MacConnell, first in his position as a collector and later as manager of the Bureau of Medical Economics. For the last five years of MacConnell's employment, the Bureau of Medical Economics had sustained losses, and as a result, MacConnell was terminated.

Beginning shortly before MacConnell was terminated, a series of acts of vandalism began at Fred Mitten's house. Paint was splashed on the house and cars, and rocks were thrown through the windows. As a result, Fred Mitten's wife, Eileen, was hospitalized twice, once with a heart attack. After each of these attacks, Fred discussed the incidents with his son, Anthony. On more than one occasion, Fred Mitten wondered aloud if MacConnell had done it. The basis of Fred Mitten's suspicion was that the paint used by the vandal was the same color as, MacConnell's recently painted house. In addition, Mitten believed that MacConnell was angry at having been ter-

minated, and that he was prone to "violent rages."

Following MacConnell's termination, Fred Mitten was asked by doctors associated with Maricopa County Medical Society for the reason for MacConnell's discharge. In response to inquiries from Dr. Kennedy and Dr. Frazier, Mitten stated that he assumed MacConnell was terminated because the Bureau had been losing money for five years.

## CONVERSATIONS WITH ANTHONY MITTEN

When discussing the incidents of vandalism with his son, Fred Mitten speculated over who might have been responsible. Fred Mitten stated in his deposition:

"Q Did you ever tell anyone that you had suspicion or reason to believe that Mr. MacConnell had in some way participated in or been responsible for, directly or indirectly, the vandalism of your home?

"A The first time it happened I told my son that I wondered if Forrest did it. I didn't say he did, I said I wondered if he did it.

"Q Did you ever on any other occasion tell anyone—

"A No.

"Q —that Mr. MacConnell, in your opinion, or in your suspicion, that Mr. MacConnell had something to do with the vandalism of your home?

"A No."

We believe that the remarks made by Fred Mitten to his son Anthony were conditionally or qualifiedly privileged. There is, admittedly, no strict formula by which a conditional privilege is applied. Rather, the process is one of weighing the individual's interest in reputation against society's interest in free speech and in encouraging certain beneficial communications. In doing so, we will look to the occasion in which the statement was made and not the statement itself.

"It is the occasion for the publication rather than the language thereof which

gives rise to the privilege, and the privilege attaches in spite of the character of the publication itself, and continues until properly rebutted." *Phoenix Newspapers v. Choisser*, 82 Ariz. 271, 276, 312 P.2d 150, 154 (1957). See also *Roscoe v. Schoolitz*, 105 Ariz. 310, 464 P.2d 333 (1970).

■ We believe the family relationship provides a qualified privilege for the statements made by Fred Mitten to his son. Section 597 of the Restatement (Second) of Torts states as to family relationships:

"§ 597. Family Relationships

"(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects the well-being of a member of the immediate family of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family.

"(2) An occasion makes a publication conditionally privileged when the circumstances induce a correct or reasonable belief that

(a) there is information that affects the well-being of a member of the immediate family of the recipient or of a third person, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family, and

(c) the recipient has requested the publication of the defamatory matter or is a person to whom its publication is otherwise within generally accepted standards of decent conduct."

In the instant case, the Mitten's house had been vandalized on more than one occasion. Paint had been hurled at the house, their cars had been splattered with paint, and rocks had been thrown through the front window. The incidents occurred when the Mittens were gone and in the early hours of the morning. It was evident that these attacks were calculated to be unexplained and frightening to the Mittens.

They had achieved the desired effect. Fred Mitten was concerned about the acts of vandalism and worried about his wife, who was ill and suffered a heart attack believed to be caused in large part by her fear and worry about the continuing acts of vandalism. It is to be expected that Fred Mitten would discuss the matter with his son, Anthony. In view of the disturbing occurrences of vandalism and Mrs. Mitten's precarious health, it would indeed be surprising if Fred Mitten had not communicated his concerns to his son. We believe that this communication is an occasion which justifies application of the qualified privilege. We hold that this communication comes within the scope of the conditional privilege of § 597 of the Restatement (Second) of Torts. See W. Prosser, Law of Torts, § 115 (4th ed. 1971). We find no abuse of this privilege. See *Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau*, Ariz., 637 P.2d 733 (1981) (filed this day).

But MacConnell claims that statements made by Fred Mitten to Vice Chief Justice Holohan of this court were also actionable. MacConnell alleges that Fred Mitten told Justice Holohan that MacConnell had vandalized Mitten's house. The evidence before the court, however, does not indicate that Fred Mitten expressed to Justice Holohan any opinion that MacConnell was responsible for the vandalism. Fred Mitten testified as follows:

"Q —you have spoken with Justice Holohan about this?

"A Yes.

"Q You told him that there was information available to you that leads you to believe that in some way Mr. MacConnell vandalized your home?

"MR. SHUGHART: I object to the form of the question, if it is a question. If that is so, it misstates his testimony and has no foundation.

"MR. FRIEDMAN: I certainly think I have restated all of his prior testimony, I'm now making him—

"MR. SHUGHART: Would you repeat the last question?

(The last question was read back.)

"MR. SHUGHART: Did you?

"THE WITNESS: Yes.

"Q (BY MR. FRIEDMAN): Did you tell him you thought he had vandalized your home?

"A No.

"Q Did you tell him you thought it was a former employee?

"A No."

Even though Frederick Mitten appears at first to have been confused by the questions regarding whether he told Justice Holohan that MacConnell was responsible for the vandalism, when read with the rest of the testimony it is clear that Frederick Mitten did not tell Justice Holohan that MacConnell was the one who committed the vandalism, but merely discussed the vandalism without mentioning his suspicions as to who was responsible. There being no evidence to the contrary, we find no error.

## DEFAMATORY CONTENT OF THE STATEMENTS REGARDING PLAINTIFF'S TERMINATION

MacConnell urges that defendant Fred Mitten's statements to Drs. Kennedy and Frazier that the Bureau of Medical Economics had been losing money for five years tended to reflect negatively on plaintiff's professional competence and therefore constituted actionable defamation. We note that Mitten prefaced his comments, at least to Dr. Frazier, by saying that for years MacConnell had been the best collection agency manager in the country.

Facially, the statements are not defamatory. They simply stated that the Bureau had been losing money under · plaintiff's management, a fact undisputed by the parties. Frederick Mitten's opinion about the reason for MacConnell's discharge was not laden with any false factual content, nor did it imply undisclosed defamatory facts. It was pure opinion and not actionable. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Restatement (Second) of Torts, § 566 and Comments.

## SUMMARY JUDGMENT

On a motion for summary judgment, the facts are viewed in the light most favorable to the party opposing the motion. *Portonova v. Wilkinson*, 128 Ariz. 501, 627 P.2d 232 (1981). Nevertheless, the party opposing the motion for summary judgment may not rest on the pleadings. The adverse party must respond with specific facts showing a genuine issue for trial. *Modla v. Parker*, 17 Ariz.App. 54, 495 P.2d 494 (1972); *Sewell v. Brookbank*, 119 Ariz. 422, 581 P.2d 267 (App.1978). Rule 56(e), 16 A.R.S. states:

"* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

The plaintiff has produced no evidence of any alleged defamation other than the statements discussed above. There are no genuine issues of fact that require a trial.

Summary judgment affirmed.

HAYS and GORDON, JJ., concur.