811 P.2d 323

**David YETMAN,**
**Plaintiff/Appellant/Cross–Appellee,**

**v.**

**William ENGLISH,**
**Defendant/Appellee/Cross–Appellant.**

**No. CV–89–0363–PR.**

Supreme Court of Arizona,
En Banc.

April 18, 1991.

Law Offices of William J. Risner by William J. Risner, Tucson, for plaintiff/appellant/cross-appellee.

O'Dowd, Burke & Lundquist by Erik M. O'Dowd, Robert E. Lundquist, Tucson, for defendant/appellee/cross-appellant.

## OPINION

FELDMAN, Vice Chief Justice.

David Yetman petitioned us to review a court of appeals opinion affirming the trial court's refusal to instruct the jury on the issue of punitive damages in his defamation action against William English. English filed a cross-petition for review, claiming his remarks were absolutely protected expression under the first amendment to the United States Constitution and article 2, § 6 of the Arizona Constitution. Given the importance of the issues, we granted review only of the cross-petition to address the interplay between the constitutional protections of speech and the traditional law of defamation. *See* Rule 23, Ariz.R.Civ.App.P., 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

The facts set forth in the court of appeals' opinion are essentially undisputed. *See Yetman v. English,* 163 Ariz. 73, 74, 786 P.2d 403, 404 (Ct.App.1989).

In August 1985, Yetman, a Democrat, was an elected member of the Pima County Board of Supervisors, and English, a Republican, was an elected member of the Arizona House of Representatives. English was the invited speaker at a luncheon meeting of the Pima County Republican Club. At the end of his speech, English responded to questions from the audience. A member of a rural property owners' association asked English his opinion of a proposed rural down-zoning change and whether he believed·Yetman was behind the proposal. English responded with a lengthy answer, during the course of which he specifically referred to Yetman's alleged refusal to consider input from property owners and asked, "What kind of communist do we have up there that thinks it's improper to protect your interests?"

Yetman sued English for defamation. The trial court refused to instruct the jury on the issue of punitive damages but found that English's remark was libelous per se. The jury awarded Yetman $5,000 in damages.

Yetman appealed the trial court's refusal to give the requested punitive damages instruction. English cross-appealed the trial court's ruling that his remarks constituted libel per se. A divided court of appeals affirmed both rulings. In dissent, Judge Livermore viewed the comment as a "vigorous epithet" used to describe and "denigrate" Yetman's opposition to the property owners. *Id.* at 76, 786 P.2d at 406. He characterized English's remarks as non-actionable "rhetorical hyperbole," common to, and essential for, "robust" political discourse. *Id.*

In his cross-petition for review, English urges us to adopt Judge Livermore's dissent. We granted review to determine the extent to which the policies embodied in the state and federal constitutional protections of speech may limit recovery for injury to reputation otherwise actionable at common law.

## DISCUSSION

The common law of defamation recognized no distinction between statements of fact on the one hand and opinion or hyperbole on the other. *Milkovich v. Lorain Journal Co.,* —— U.S. ——, ——, 110 S.Ct. 2695, 2702, 111 L.Ed.2d 1 (1990). But the common law did recognize the importance of uninhibited discussion in social, political,

economic, artistic, and literary matters. The privilege of "fair comment," therefore, protected the honest expression of defamatory statements of opinion so long as they were drawn from a true or privileged statement of facts. 1 F. HARPER & F. JAMES, THE LAW OF TORTS § 5.28, at 456 (1956). However, the privilege was defeasible on a showing that the comment was motivated by some purpose inconsistent with the social policy supporting the privilege of fair comment, or was motivated solely by malice, in the common law sense of ill will or spite. PROSSER & KEETON ON THE LAW OF TORTS § 115, at 833–34 (5th ed.1984) (hereafter PROSSER & KEETON); 2 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 5.27 (1986). In this manner, the common law attempted to reconcile society's interest in unfettered discussion in matters of public concern with the individual's interest in redressing injury to reputation and good name. These principles, however, have been largely absorbed into recent developments in the law of defamation.

### A. Rhetorical Hyperbole, Free Expression and the First Amendment

English bases his claim for absolute protection on the decisions of the United States Supreme Court. In *New York Times Co. v. Sullivan*, the Court addressed the concern that the common law rule requiring a speaker to "guarantee the truth of his factual assertions" would impair criticism of government conduct and deter speech protected by the first and fourteenth amendments. 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). The Court adopted a "federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at

726. Under proper instructions, the jury in the present case found "actual malice."

English argues that, despite the finding of actual malice, his comment is entitled to absolute protection under subsequent opinions extending constitutional protection to certain *types* of speech. For instance, he relies on *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler*, which involved a real estate developer who requested zoning variances from the city council for one parcel of land while holding a separate parcel the council wished to purchase. 398 U.S. 6, 7, 90 S.Ct. 1537, 1538, 26 L.Ed.2d 6 (1970). A local newspaper reported that at public meetings concerning the transactions some people had characterized the developer's negotiating position as "blackmail." *Id.* Bresler brought a defamation action, contending that the use of the word "blackmail" implied that he had committed the actual crime of blackmail. *Id.* at 13, 90 S.Ct. at 1541.

The United States Supreme Court rejected the contention, stating that "the imposition of liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the [newspaper]." *Id.* The Court stated that no reader could have interpreted the articles to charge Bresler with committing a criminal offense; "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1542.

The Court reached similar results in two other cases. In *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, it held that the use of the word "traitor" in trade union literature defining a "scab"[1] could not be the basis of a defamation action under federal labor law because the term was used "in a loose, figurative sense" and was "merely rhetorical

---

**1.** The vitriolic definition is generally attributed to author Jack London. *Letter Carriers,* 418

U.S. at 268, 94 S.Ct. at 2773.

hyperbole, a lusty and imaginative expression of the contempt felt by union members toward those who refuse to join." 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974). Finally, in *Hustler Magazine, Inc. v. Falwell*, the Court held that the first amendment precluded recovery, even under the theory of intentional infliction of emotional distress, for an ad parody alleging that a religious figure's first sexual encounter was with his mother in an outhouse because it "could not reasonably have been interpreted as stating actual facts about the public figure involved." 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988).

English's claim for absolute protection under the federal constitution is based on a considerable body of federal law holding that the expression of opinion is absolutely privileged under the first amendment. This view emanated from dictum in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See, e.g., Ollman v. Evans*, 750 F.2d 970, 974 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1194 (9th Cir.), *cert. denied*, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989); *MacConnell v. Mitten*, 131 Ariz. 22, 25, 638 P.2d 689, 692 (1981) (applying federal law).[2] But English's position has been weakened; last year in *Milkovich*, the United States Supreme Court reviewed the constitutional protections it had grafted onto defamation law and explicitly rejected the contention that *Gertz* and its progeny were "intended to create a wholesale defamation exception for [everything] that might be labeled 'opinion.'" —— U.S. at ——, 110 S.Ct. at 2705. The Court rejected the idea that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment." *Id.* at ——, 110 S.Ct. at 2707.

In rejecting an absolute privilege and the need for "an artificial dichotomy between 'opinion' and fact," the Court listed the following protections as adequate to ensure that debate on public issues remains "uninhibited, robust, and wide open." *Id.* at ——, 110 S.Ct. at 2706 (quoting *New York Times*, 376 U.S. at 270, 84 S.Ct. at 720). First, the Court stated that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law...." *Id.* at ——, and n. 6, 110 S.Ct. at 2706 and n. 6 (relying on *New York Times* and *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)).

Second, the Court stated:

[T]he *Bresler–Letter Carriers–Falwell* line of cases provide protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. *Falwell*, 485 U.S. at 50, 108 S.Ct. at 879. This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation.

*Milkovich*, —— U.S. at ——, 110 S.Ct. at 2706.

Third, the Court stated that the malice requirements set forth in *New York Times, Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and *Gertz* provide additional protection for statements of "opinion" on matters of public concern that reasonably imply false and defamatory facts about public figures or

---

**2.** The origin of the opinion privilege comes from *Gertz*:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

418 U.S. at 339–40, 94 S.Ct. at 3007 (footnote omitted).

Circuit Judge Henry Friendly aptly noted that this passage "has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though [*Gertz*] did not remotely concern the question." *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61 (2d Cir.1980); *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2705.

officials. *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2707.

Finally, the Court stated that the enhanced appellate review required by *Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), and *New York Times* in cases raising first amendment issues "provides assurance that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion of the field of free expression.'" *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2707 (citation omitted).

■ We must examine English's statement in light of these principles to determine whether it is absolutely protected expression under the first amendment to the United States Constitution.

### B. Actionability

English's argument touches on two of these factors. *Milkovich* requires us to examine English's claim for absolute privilege by considering two closely related questions: whether the statement, considering its content and context, could reasonably be interpreted as stating actual facts about Yetman under *Bresler–Letter Carriers–Falwell*, and whether the statement was provable as false under *New York Times* and *Hepps*.

### 1. *Statement of Actual Fact*

In *Milkovich*, the Supreme Court dealt with a sports column that charged that "Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." The Court held as a matter of law that the words were actionable because, though the statement reflected the writer's opinion, it was nonetheless a statement of actual fact—a charge that Milkovich had committed perjury. *Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2707. This, the Court said, "is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining [Milkovich] committed the crime of perjury. Nor does the general tenor of the article negate this impression." *Id.* at ——, 110 S.Ct. at 2707. The essence of the test prescribed by *Mil-*

*kovich* for whether a comment is actionable has recently been described as follows:

> The key inquiry is *whether the challenged expression*, however labeled by defendant, *would reasonably appear to state or imply assertions of objective fact*. In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to "opinion" ["hyperbole"] immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, *courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person.*

*Immuno, A.G. v. Moor–Jankowsky*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) (emphasis added).

With these principles in mind, we turn to the present case. Was English's remark—"what kind of communist do we have up there that thinks it's improper to protect your interests?"—one that stated or implied an assertion of objective fact "from the point of view of the reasonable person" hearing it at the time and under the circumstances under which it was made? *Id.* We doubt that the average person would interpret the remark as an assertion that Yetman was a card-carrying member of the Communist Party or otherwise connected in some formal capacity. However, such explicit charges have never been a prerequisite for actionability.

It is precisely this lack of explicitness that accounts for the sting of remarks associating an individual with communist beliefs or practices. As Judge Learned Hand explained, "it is not uncommon for [those alarmed about communism] to feel less concern at avowed propaganda than at what they regard as the insidious spread of the dreaded doctrines by those who only dally and coquet with them, and have not the courage openly to proclaim themselves." *Grant v. Readers Digest Ass'n*, 151 F.2d 733, 735 (2d Cir.1945). And, indeed, courts have long recognized that "the merest public suggestion of association by an individu-

al with any phase of [communism], remote or near, [has] fearsome capacity for injury to reputation." *Herrmann v. Newark Morning Ledger Co.*, 49 N.J.Super 551, 140 A.2d 529, 533–34 (1958). Thus, in *Gertz*, charges that the plaintiff was a "Leninist" and "Communist-fronter" were deemed sufficiently factual that their defamatory aspect was assumed. *Gertz*, 418 U.S. at 326, 94 S.Ct. at 3000; *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61–62 (2d Cir.1980); *see Renwick v. News & Observer Publishing Co.*, 63 N.C.App. 200, 304 S.E.2d 593, 603 (1983).

■ This court previously examined the factual content of a statement imputing communism in *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 447 P.2d 840 (1968), *cert. denied*, 394 U.S. 959, 89 S.Ct. 1307, 22 L.Ed.2d 560 (1969). After considering an editorial that equated a political candidate's proposal for a "people's council" with the "people's councils" of the Communist Party, we found the editorial defamatory because it charged the plaintiff with "espousing a Communist doctrine involving intimidation, blackmail and terrorism." *Id.* at 588, 447 P.2d at 846. One could argue that the result in *Church* could not survive the analysis required by recent cases, especially *Milkovich*. We need not decide that today. We cite *Church* only for the proposition, undisturbed by recent cases, that a factual assertion that the plaintiff espouses and applies communist doctrine is actionable, even though it does not charge the plaintiff with actual membership in the party. *See also Gertz*, 418 U.S. at 326, 332, 94 S.Ct. at 3000, 3003.

■ We recognize that the standards of defamation necessarily fluctuate with the vicissitudes of time and public opinion. 2 F. HARPER, F. JAMES & O. GRAY, *supra* § 5.1. We, of course, have no brief to determine when and whether societal attitudes should change. We must consider actual damage to reputation in the real world by measuring the defamatory aspect of a publication by its natural and probable effect on the mind of the average recipient. *Church*, 103 Ariz. at 587, 447 P.2d at 845. When English made his remarks in 1985, then-President Reagan had recently characterized the Soviet Union as the "evil empire," and the specter of communist domination was still very real to a sizable segment of the populace.

■ Thus, if a reasonable listener could have taken English's comment as stating or implying factual assertions that Yetman espoused and applied communist doctrine or ideology, then it was not absolutely privileged. We must turn, therefore, to interpret the comment or, at the very least, to decide who must interpret the comment.

### 2. *Interpretation*

■ We note first that in interpreting such comments, the publication is to be measured not by the "critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average [listener]." *MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536, 343 P.2d 36, 41 (1959); *see also* Restatement (Second) of Torts § 563 (1977) (hereafter Restatement).

■ As noted previously, the comment was not explicit. If interpreted as nothing more than rhetorical political invective criticizing Yetman's political techniques, then the comment was privileged. *Bresler*, 398 U.S. at 14, 90 S.Ct. at 1542. If it stated or implied a factual accusation, it was not absolutely privileged. Again, the question is "whether or not a reasonable fact-finder could conclude" that the statements at issue state or imply an assertion of actual fact. *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2707.[3]

---

**3.** The trial court did rule in the present case that the accusation that Yetman espoused communist ideology or had adopted communist methods was libelous per se. This ruling, of course, is in accord with the holding in *Church*. 103 Ariz. at 588, 447 P.2d at 846. Instructing the jury, as the trial court did, that the comment was libelous per se means "that the publication is of such a character as to make the publisher liable for defamation although no special harm results from it, unless the defamatory matter is true or the defamer was *privileged* to publish it." Restatement § 569 comment b (emphasis added).

Under the *Church* rule, the comment would be libelous per se if it accused Yetman of adher-

### a. The Role of the Judge

In recent years, since *Gertz,* courts have tended to characterize the fact/opinion-hyperbole determination as one of constitutional law for the judge to decide and not for the jury. *See, e.g., Amcor Inv. Corp. v. Cox Arizona Publications,* 158 Ariz. 566, 569, 764 P.2d 327, 330 (Ct.App.1988) ("It could hardly be otherwise in view of the constitutional basis for the protection of opinion.") (citing *Lewis v. Time,* 710 F.2d 549, 555 (9th Cir.1983)). This result, we believe, is clearly attributable to the *Gertz* dictum, giving statements of opinion an absolute privilege. *See, e.g.,* Restatement §§ 566 and 618, which were changed in direct response to *Gertz.* We believe there was considerable question before *Milkovich* whether *Gertz's* absolute privilege left the determination between fact or opinion to the court in all cases. The United States Supreme Court had never so stated and, of course, such a result brings the first amendment into direct and possibly unnecessary conflict with the seventh amendment guarantee of trial by jury in all common law cases. The law of libel, of course, has deep roots in the common law, and we must guard against the danger that the judiciary will "usurp the role of the jury and burden the appellate courts with original jurisdiction in libel actions impinging on a plaintiff's constitutional right to a jury trial." *Connaughton v. Harte–Hanks Communications,* 842 F.2d 825, 842 (6th Cir.1988), *aff'd,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

Because *Milkovich* explicitly rejects the *Gertz* dictum that there is a separate constitutionally based privilege for opinion, we believe it helpful to look to pre-*Gertz* authority. The first Restatement of Torts clearly states that the jury is the entity to determine whether the offensive comment is a statement of fact. Restatement of Torts § 618 comment b (1938). "Thus, the jury determines whether what appears to be comment is actually statement implying the existence of facts which can be justified

only by proof of their truth or the privileged character of the occasion...." *Id.* Leaving the question to the jury also comports better with the statement in *Milkovich* that the dispositive question is whether "a reasonable *factfinder* could conclude" that the comment at issue stated or implied actual facts. —— U.S. at ——, 110 S.Ct. at 2707 (emphasis added); *see also Falwell,* 485 U.S. at 56, 108 S.Ct. at 882 ("The *jury* found against respondent on his libel claim when it decided that the Hustler ad parody could not 'reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.'" (emphasis added, citation omitted)). Given the words of the Supreme Court just quoted, the protections of the seventh amendment, and the Court's disapproval of *Gertz's* dictum, we believe the better view to be that which was held before *Gertz* and later reaffirmed by the California Supreme Court.

> In our view the article is ambiguous and we cannot as a matter of law characterize it as either stating a fact or an opinion. In these circumstances, it is for the jury to determine whether an ordinary reader would have understood the article as a factual assertion charging Hogard with crime, or whether the statements were generally understood as an opinion respecting his public conduct....

*Good Government Group v. Superior Court,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 262, 586 P.2d 572, 576 (1978), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979).

> This conclusion is not contrary to our statement [in the previous case] that the distinction between fact and opinion is a question of law; that remains the rule if the statement unambiguously constitutes either fact or opinion. Where, as here, however, the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury's determination.

---

ing to communist ideology. The absolute privilege problem we deal with in this section of the opinion is different and is a predicate to the question of libel per se.

*Id.*[4]

We believe also that the better weight of authority supports the view taken in *Good Government Group.* *See, e.g., King v. Globe Newspaper Co.,* 400 Mass. 705, 512 N.E.2d 241 (1987), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988); *Nevada Independent Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337 (1983); *Julian v. American Business Consultants,* 2 N.Y.2d 1, 155 N.Y.S.2d 1, 14, 137 N.E.2d 1, 20 (1956); *Renwick,* 304 S.E.2d at 611–12.

■ Thus, we believe *Milkovich* contemplates that the trial court should determine whether a statement is an actionable factual assertion in a manner analogous to the common law determination of defamatory content. The trial court decides, in the first instance, whether, under all the circumstances, a statement is capable of bearing a defamatory meaning. Restatement § 614. The jury then decides whether the defamatory meaning of the statement was in fact conveyed. *Id.* But,

[i]n some cases imputations are so clearly innocent or so clearly defamatory that the court is justified in determining the question itself. On the other hand, if, in the opinion of the court, the question is one on which reasonable men might differ, it is for the jury to determine which of the two permissible views they will take.

*Id.* comment d.

■ Thus, only in the clearest cases may courts, applying the principles laid down in *Milkovich,* determine as a matter of law that the assertions before them state or imply actual facts and are therefore entitled to no constitutional protection. *See White v. Fraternal Order of Police,* 909 F.2d 512, 523 (D.C.Cir.1990); *Beasley v. St. Mary's Hosp.,* 200 Ill.App.3d 1024, 146 Ill. Dec. 714, 720, 558 N.E.2d 677, 683 (1990). In other cases, it will be clear that the assertions at issue employ "loose, figurative or hyperbolic language," and cannot

reasonably be interpreted as stating or implying actual facts. *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2707; *see, e.g., Bresler–Letter Carriers–Falwell.*

■ There remains the category of cases involving assertions to which reasonable people might clearly give conflicting interpretations. In these cases, the question must be left to the jury. *Good Government Group,* 150 Cal.Rptr. at 262, 586 P.2d at 576; *Julian,* 155 N.Y.S.2d at 14, 137 N.E.2d at 20.

■ Given the rigorous scrutiny required by the first amendment at both the trial and appellate levels (*see Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 724 P.2d 562 (1986), and *Bose Corp. v. Consumers Union*), it will be necessary for courts to carefully examine every alleged defamatory statement and rigorously apply the *Milkovich* standards to ensure that first amendment concerns are protected. This examination must ensure that the matter is left to the jury only where there are truly two tenable views or interpretations of the statement.

#### b. Application

■ We must examine English's remark with these principles in mind and determine into which category it falls. Invective used by one politician about another at a meeting of the former's political adherents and the latter's opponents is often unrestrained. Such lack of restraint, indeed incivility, is both regrettable and protected by the first amendment. Thus, we believe that the comment, made in such a setting and in such a context, could easily be interpreted as nothing more than rhetorical political invective or hyperbole. We reject, therefore, Yetman's submittal that as a matter of law the comment could only have been reasonably interpreted as a nonprivileged assertion of fact.

English contends, on the other hand, that the comment could only reasonably have

---

4. The Court distinguished the case before them from *Bresler,* pointing out that in *Bresler* the context of the remark made it clear that the terms "blackmail" and "extortion" could not

have been understood as charging a crime. *Good Government Group,* 150 Cal.Rptr. at 262, 586 P.2d at 577.

been interpreted as a privileged non-factual assertion—political invective and hyperbole. We believe, however, that the words of the comment are sufficiently ambiguous that a reasonable listener in that audience—composed of Yetman's political opponents, angry at his position on the issue— might reasonably interpret the words as a statement or implication of fact. More important, the evidence adduced at trial supports such an interpretation. First, the portions of English's deposition admitted in evidence at the trial indicate English meant the remark as an assertion of fact.[5] While English's intent in making the remark is most relevant on the issue of malice, it is certainly difficult to argue that no reasonable person could have understood the remark as an assertion of fact when the speaker concedes it was intended as such. Second, the newspaper reporter—experienced on the political "beat"—who heard the remark interpreted it as an assertion of fact. Reporter's Transcript (RT), Oct. 22, 1987, at 25–27. Finally, there was expert evidence that the remark was susceptible to the interpretation that Yetman was actually a communist.[6]

Given all of this, we must also reject English's contention that as a matter of law the comment could only have been reasonably interpreted as invective or hyperbole and not as an assertion or implication of actual fact.

■ We believe, therefore, that the comment in issue was sufficiently equivocal that its interpretation should have been left to the jury, under proper instructions. The remark was simply one that had no bright line meaning and that, given the circumstances and context, could reasonably be interpreted either way. Notwithstanding stringent application of the legal standards at both trial and appellate stages of litigation, we believe this is truly a question on which reasonable minds might often differ and that the seventh amendment therefore requires that the issue of interpretation be left to the jury.

■ Given the constitutional protections that must be considered, however, "leaving the issue to the jury" requires that the jury be properly instructed that if the comment is not interpreted as asserting or implying actual fact, but only as "mere

---

**5.** Q: Do you—and do you think David Yetman follows a communist philosophy?
A: I believe I have explained previously that there are certain philosophies which I believe he follows which fall in that category. But to say that he follows that philosophy across the board, I certainly cannot say that, and I have never said that at all.
Q: Well, let me ask you, if I—if I asked you the following questions and answers on July 2, 1986.

 * * * * * *

[Yetman's counsel impeaches English with statements from his previous deposition.]
Q: So I would like, if you could, to define for me what it means if someone's a communist.
A: First of all, I didn't say that David Yetman is a communist. First of all, and in spite of what the newspaper and paragraph four likes to say, communism to me is a philosophy which essentially involves some form of total government or something approaching total government control over land, control over lives, control over the marketplace, control over business and that type of thing.
Q: Anything more?
A: I think that basically covers it.
Q: Do you think David Yetman believes in the specific thing that you have enumerated?
A: Yes.

Q: Do you think he believes in total government?
A: Yes.
Q: And total control over lives?
A: Yes.
Q: And control by the government, I take it, over the marketplace?
A: Yes.
Q: And over business?
A: And—
Q: And total control over business?
A: Yes.
Q: So then let me ask you again, do you think David Yetman is a communist?
A: I would say again I have answered that question to the best of my ability.
Q: Were those questions asked and those answers given?
A: Yes, I believe that's consistent with what I told you already today.
Reporter's Transcript, Oct. 22, 1987, at 185–87.

**6.** Professors John Schwarz and John Crow testified about the results of highly respected studies concerning public intolerance toward those who have been alleged to be communists and stated that English's remark could have been interpreted by members of the public as an allegation that Yetman was a communist. RT, Oct. 22, 1987, at 82, 115.

opinion," hyperbole, parody, invective, or the like, then it is absolutely privileged and their verdict must be for the defendant. No such instruction was given in this case, and we conclude, therefore, that the trial judge erred in subsuming the question of actionability under the rubric of libel per se.[7]

This brings us to the question of waiver.

### 3. *Procedural Default*

■ English did not request a trial court ruling or a jury instruction on the actionability of his remark. However, given first amendment obligations to independently review the record to prevent any intrusion on free expression, we find no procedural waiver under the peculiar circumstances of this case. *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2707; *Dombey,* 150 Ariz. at 482–83, 724 P.2d at 568–69.

At the time this case was tried and at the time it was argued on appeal, the leading cases spoke only of absolute privilege for statements of opinion, including hyperbole. *Milkovich* was decided two months after we heard oral argument in this case. We cannot fault English or his counsel for failing to request the trial judge to instruct the jury on a fundamental principle of law that had not yet been clearly articulated by the United States Supreme Court or by this court. *See MacConnell,* 131 Ariz. at 25, 638 P.2d at 692; *Amcor,* 158 Ariz. at 568, 764 P.2d at 329. Further, English has continually pressed his rhetorical hyperbole argument in reliance on *Bresler* and *Letter Carriers* in the trial court, in the court of appeals, and in this court. Given our obligations in first amendment cases (*see Dombey* ), we conclude there has been no waiver and turn to the final factor articulated in *Milkovich.*

### 4. *Provable Falsity*

Implicit in the Supreme Court's rejection of an absolute privilege for opinion is the assumption that the existing requirement of proving falsity already insulates from liability many statements that would ordinarily be characterized as opinion. For instance, the statement that "Jones is a contemptible human being" would be nonactionable because Jones's contemptibility, *vel non,* is not the kind of empirical question a fact-finder can resolve.

The Court has also recognized that some statements of fact, as a practical matter, simply cannot be proven conclusively true or false. *E.g., New York Times,* 376 U.S. at 279, 84 S.Ct. at 725. At common law, the defendant had the burden of proving the truth of a defamatory publication as an affirmative defense. Restatement § 581A comment b. For unprovable factual statements, the defendant could not meet this burden, and liability would result. This rule, of course, might inhibit first amendment freedoms because placing "the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Hepps,* 475 U.S. at 777–78, 106 S.Ct. at 1564. The Court therefore shifted the burden of proof by requiring the plaintiff to prove falsity, thus ensuring that true but unprovable statements of fact would remain protected, though the Court recognized that this "will insulate from liability some speech that is false, but unprovably so." *Id.*

We believe that if English's remarks were interpreted to convey actual facts, those facts do not fall within the zone of unprovable statements. A reasonable fact-finder could determine from evidence presented whether Yetman did, in fact, espouse and practice communist philosophy[8] or tactics such as denying citizens the opportunity to petition government officials. Therefore, the requirement of proving falsity provides no additional protection to English.

---

7. *See supra* note 3. The libel per se issue bears on damage questions (Restatement § 569), but before reaching that question, the jury must be instructed to first determine whether the comment was absolutely privileged or actionable instead as an assertion of fact.

8. According to English, this means "total government control over land ... lives ... market place [and] business." *See supra* note 5.

82

Having applied the substantive standards articulated in *Milkovich,* we conclude that the statement was not absolutely privileged.

C. Arizona Constitution

 English also argues that his remark was absolutely privileged under article 2, § 6 of the Arizona Constitution. Article 2, § 6 provides for the freedom of speech and press in the following terms:

Section 6. Freedom of speech and press

Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

The provision undeniably imposes responsibility on those exercising their rights to free speech for any abuse thereof. The first amendment to the United States Constitution contains no similar liability-imposing language. *See Brown v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 257 Cal.Rptr. 708, 730, 771 P.2d 406, 428 (1989). It states only that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. 1.

None of the language in article 2, § 6 of the Arizona Constitution even remotely suggests an absolute privilege to damage the reputation of another person. Early Arizona cases interpreting article 2, § 6 emphasize the availability and adequacy of a civil defamation action for those injured by the abuse of free speech. *See, e.g., Truax v. Bisbee Local No. 380,* 19 Ariz. 379, 394, 171 P. 121, 127 (1918).

Indeed, we have an independent constitutional obligation to ensure that the right to recover damages for injury to reputation is not unduly impinged. Article 18, § 6 of the Arizona Constitution provides that the "right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." Nothing in the text or history of article 2, § 6 tends to establish any absolute privilege for defamatory and malicious assertions of fact. If anything, text and history proscribe any

abrogation of the right to recover damages for injury to reputation. *Boswell v. Phoenix Newspapers, Inc.,* 152 Ariz. 9, 17, 730 P.2d 186, 194 (1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987).

We conclude that, whatever its scope of application in other areas,[9] article 2, § 6 of the Arizona Constitution provides no greater privilege for otherwise defamatory statements than the first amendment of the United States Constitution.

CONCLUSION

We find that English's remarks are not absolutely protected under article 2, § 6 of the Arizona Constitution. We also reject English's claim that as a matter of law his remarks are absolutely protected under the first amendment of the United States Constitution. On the other hand, we recognize that the first amendment forbids us to affirm if English's remarks could reasonably have been understood by the average listener as merely hyperbolic or figurative language. We believe, however, that the comment is one that reasonable people might interpret differently. We must therefore reverse for a new trial in which the jury will determine whether the average listener would have interpreted English's remark to state or imply actual facts about Yetman.

We vacate the court of appeals' opinion, reverse the judgment, and remand for proceedings consistent with this opinion.

MOELLER, J., and EINO M. JACOBSON, Vice Chief Judge, concur.

Gordon, C.J., did not participate in this decision; pursuant to article 6, § 3 of the Arizona Constitution, EINO M. JACOBSON, Vice Chief Judge, of the Court of Appeals, Division One, was designated to sit in his stead.

CAMERON, Justice, dissenting in part and concurring in part:

For the reasons stated by Judge Livermore in his dissent, I dissent as to that

**9.** *See, e.g., Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 773 P.2d 455 (1989).

portion of the opinion holding that the remarks constituted slander per se.

As to the rest of the opinion of this court, I concur.

CORCORAN, Justice, dissenting:

I respectfully dissent. The Constitution of the United States tells us that:

> Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I. The Arizona Declaration of Rights provides that:

> Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

Ariz. Const. art. 2, § 6. The Declaration also provides that:

> The right of petition, and of the people peaceably to assemble for the common good, shall never be abridged.

Ariz. Const. art. 2, § 5.

In this case, English, a Republican-elected member of the Arizona House of Representatives, is sued by Yetman, a Democrat-elected member of the Pima County Board of Supervisors, for defamation. The facts are adequately set forth in the court of appeals' opinion and dissent.

The dispute arises out of a proposed zoning change that might have diminished the value of land owned by members of English's audience, the Pima County Republican Club. English was asked his opinion of the proposed zoning change and whether he believed Yetman was behind the proposal. English gave a lengthy answer, during which he asked rhetorically:

> What kind of communist do we have up there that thinks it's improper to protect your interests?

This puerile generic invective has spawned a tempest in a teapot. English did *not* accuse Yetman of being a member of the Communist Party U.S.A., Communist Party U.S.S.R., a Marxist–Leninist, a Maoist, or anything of that kind. The statement by English is no more defamatory than the following retort would have been:

> What kind of fascist do we have down there that thinks it's improper to protect the common good?

This comment does not refer to alleged membership in the National Socialist Party or of being a Brown Shirt, or a Black Shirt. By using this example, I do not imply that politicians should attempt to equal or exceed their adversaries in political denigration, but only to point out that the converse statement is equally as innocuous.

This kind of juvenile vituperation has been and is epidemic in politics. The law of defamation, however, should not be used to impose a code of conduct on unruly politicians in an attempt to elevate their discourse. This obnoxious hyperbole, unfortunately, is here to stay.

The majority reverses and sends this case back for yet another trial. To allow this lawsuit, which is here being reviewed by the third level of the judicial system, to start all over again is to permit the misuse of principles of defamation to intimidate and flog political opponents. I agree with my colleague, Justice Cameron, and with Judge Livermore, who dissented in the court of appeals. The complaint should be dismissed.