IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

WENDY ROGERS AND HAL KUNNEN, HUSBAND AND WIFE, AND
WENDYROGERS.ORG, A PRINCIPAL CAMPAIGN COMMITTEE,
*Petitioners,*

*v.*

THE HONORABLE ROSA MROZ, JUDGE OF THE SUPERIOR COURT OF THE
STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge,*

PAMELA YOUNG, AN INDIVIDUAL; MODELS PLUS INTERNATIONAL, L.L.C.
D/B/A THE YOUNG AGENCY, AN ARIZONA LIMITED LIABILITY COMPANY,
*Real Parties in Interest.*

_____

No. CV-21-0001-PR
Filed February 1, 2022
_____

Special Action from the Superior Court in Maricopa County
The Honorable Rosa Mroz, Judge
No. CV2018-013114
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
250 Ariz. 319 (App. 2020)
**VACATED**
_____

COUNSEL:

E. Jeffrey Walsh, Dominic E. Draye (argued), Greenberg Traurig, LLP,
Phoenix, Attorneys for Wendy Rogers, Hal Kunnen, and WendyRogers.org

William M. Fischbach, Amy D. Sells (argued), Ryan P. Hogan, Tiffany &
Bosco, P.A., Phoenix, Attorneys for Pamela Young and Models Plus
International, L.L.C. d/b/a The Young Agency

Mark Brnovich, Arizona Attorney General, Joseph A. Kanefield, Chief Deputy and Chief of Staff, Brunn (Beau) W. Roysden III, Solicitor General, Michael S. Catlett, Deputy Solicitor General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General's Office

_____

JUSTICE BOLICK authored the opinion of the Court, in which JUSTICES LOPEZ, BEENE, and KING joined. VICE CHIEF JUSTICE TIMMER, joined by CHIEF JUSTICE BRUTINEL, and JUDGE ESPINOSA, authored a dissenting opinion.[*]

_____

JUSTICE BOLICK, opinion of the Court:

¶1        We decide today that the First Amendment precludes a defamation action based on a political advertisement directed at an opposing candidate, in which the third-party plaintiff is unnamed, the alleged defamation is not expressed but only implied, and the asserted implication is not one that would likely be drawn by a reasonable listener.

**A.**

¶2        This case resides at the intersection of state tort law and the First Amendment.  To establish defamation under Arizona common law, "a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341 (1989).  But the First Amendment, made applicable to the states through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), limits the scope of state defamation law when applied to public figures and matters of public concern.  *See, e.g., Dombey v. Phx. Newspapers, Inc.*, 150 Ariz. 476, 481 (1986) (noting that "when a plaintiff is a private figure and the speech is of private concern, the states are free to retain

_____

[*]  Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Philip G. Espinosa, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

common law principles," but discussion about government officials and controversial issues "is at the very core of 'public concern' and is protected by the first amendment"). To this end, the First Amendment necessarily protects both the profound and the profane, not only conscientious candidates and civil discourse but unscrupulous politicians and negative campaigns as well.

¶3          Politicians are not immune from liability for defamatory statements that rain shrapnel upon innocent third parties in the heat of political battle. Candidates cannot make defamatory assertions they hope voters will believe, then, when sued for defamation, seek refuge in the defense that no one believes what politicians say. *See, e.g.*, *US Dominion, Inc. v. Powell*, No. 1:21-CV-00040, 2021 WL 3550974, at *10–12 (D.D.C. Aug. 11, 2021).

¶4          But courts must ensure that only truly meritorious defamation lawsuits are allowed to proceed, lest exposure to monetary liability chill the exercise of political debate that is the foundation of our constitutional republic. "Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability." *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12 (1970).

¶5          Defendant Wendy Rogers ran for the U.S. House of Representatives in 2018. Her opponent in the Republican primary was Steve Smith, a state legislator who also worked for plaintiff Young Agency, a modeling, acting, and talent agency owned by plaintiff Pamela Young. Roughly half the models Young Agency represents are minors.

¶6          Smith created a modeling agent profile on ModelMayhem.com ("Model Mayhem"), an internet platform and professional marketplace for the modeling industry. Smith's profile included Young Agency's logo and described the agency as one of the largest in the southwest. In the years leading up to the 2018 election, Model

3

Mayhem received extensive negative national publicity based on allegations that the website was linked to sex trafficking.

¶7        In her campaign, Rogers used Smith's association with Model Mayhem to support her campaign theme that Smith was not the family-values candidate he purported to be.  At issue in this appeal is a radio advertisement Rogers aired against Smith:

> Tom O'Halleran is a dangerous leftist and ally of Nancy Pelosi and the open borders lobby, but he'll win again if we run Steve Smith for Congress.  Smith is a slimy character whose modeling agency specializes in underage girls and advertises on websites linked to sex trafficking.  Smith opposed Trump, never endorsed Trump against Clinton and ridiculed our much needed border wall.
>
> Who'll beat O'Halleran?  Wendy Rogers.  Wendy Rogers strongly supports President Trump and the President's conservative agenda.  Wendy Rogers is a decorated Air Force pilot, small business owner, and major supporter of President Trump's border wall.  Slimy Steve Smith can't beat O'Halleran and the anti-Trump left.  Only Wendy Rogers will.
>
> Wendy Rogers for Congress.  Conservative, Republican, standing with President Trump, standing with us.  I'm Wendy Rogers and I approve this message.

The advertisement did not identify either Young Agency or Model Mayhem by name.  Young Agency and Pamela Young (collectively "Young") played no role in the campaign, and after learning about the radio advertisement, Young asked Smith to keep her out of it.

¶8        Rogers defeated Smith in the primary but lost in the general election.  Following the election, Young filed suit against Rogers for defamation and false light invasion of privacy, alleging the advertisement and a campaign blog (not at issue here) implied that Young was complicit in sex trafficking children.  Young sought discovery of Rogers' financial records relating to a claim for punitive damages.  To avoid disclosing such records, Rogers moved for summary judgment, asserting that the

4

advertisement at issue here and other challenged publications made truthful claims about matters of public concern, that Young could not meet the threshold for defamation by implication, and that Rogers did not make the statements with actual malice.  Young opposed summary judgment, arguing that as she is not a public figure, no actual malice showing is necessary and that Young was defamed by the false implication that Young was complicit in sex trafficking.  The superior court denied the summary judgment motion in a brief order, stating that it agreed with Plaintiffs' arguments.

¶9        The court of appeals granted special action review and reversed the trial court in a 2–1 memorandum decision.  As to the radio advertisement, the court concluded that "[r]easonable listeners could not confuse this unmistakable political flamethrower—deployed in the course of a high-profile, mud-filled congressional election campaign—as a statement of objective fact."  *Rogers v. Mroz*, 250 Ariz. 319, 332 ¶ 52 (App. 2020).  Applying First Amendment standards, the court concluded that Young failed to present sufficient evidence to go forward with a defamation claim and that summary judgment for Rogers was warranted.  *Id.* at 333–34 ¶ 60.

¶10       The dissenting judge concluded the advertisement was "capable of bearing a defamatory meaning," and that "the jury, rather than the court, [should be] the ultimate arbiter of 'whether the defamatory meaning of the statement was in fact conveyed.'"  *Id.* at 336 ¶ 72 (Cattani, J., dissenting) (quoting *Yetman v. English*, 168 Ariz. 71, 79 (1991)).

¶11       We granted review to decide the important question of whether the First Amendment tolerates a defamation action under the facts presented here.  We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and Arizona Rule of Procedure for Special Actions 4(a).  We review de novo whether summary judgment is appropriate. *Glazer v. State*, 237 Ariz. 160, 167 ¶ 29 (2015).

## B.

¶12       Arizona's tort of defamation traces to the common law.  In an ordinary defamation action between private individuals, a speaker may be liable for damages if a falsehood is published that injures the plaintiff's reputation.  *See, e.g., Godbehere*, 162 Ariz. at 341.  "Unless this is free from

reasonable doubt, it is for the jury to determine the meaning and construction of the alleged defamatory language." Restatement (Second) of Torts § 563 cmt. e (Am. Law Inst. 1977).

¶13        The alleged defamation need not identify the defamed person by name.  Restatement § 564 cmt. b.  Rather, "it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended," which may be supported by extrinsic facts.  *Id.*  We will call this third-party defamation.

¶14        Additionally, a statement is actionable if it implies a clearly defamatory meaning.  *See Yetman*, 168 Ariz. at 80.  This is called defamation by implication.   This case involves both of these indirect types of defamation: third-party defamation and defamation by implication.

¶15        But we do not examine the circumstances here solely through the lens of state defamation law; we do so bearing in mind that such law is constrained by First Amendment protections.  The First Amendment left undisturbed the common law of defamation and subsequent state modifications so far as they govern actions between private figures on matters of private concern.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).  But as to public figures and matters of public concern, the First Amendment marked a radical departure from common law.  Under the Crown, statements criticizing the monarch were actionable.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 274 (1964) (noting the framers of the First Amendment believed the United States' "form of government was altogether different from the British form, under which the Crown was sovereign and the people were subjects" (internal quotation marks omitted)).   Indeed, resentment over punishment for criticizing the government was an animating impulse for the American Revolution.  *See id.*

¶16        The framers of the Bill of Rights were determined to robustly protect political speech.  *Id.*  That they did, making protection of speech against government constraint foremost within our pantheon of constitutional liberties.  *Id.*  Over the ensuing centuries, spirited political campaigns filled with nasty invective and innuendo have, for better or worse, characterized American politics, dating back at least to the bitter presidential contests between John Adams and Thomas Jefferson.

*Commonwealth v. Lucas*, 34 N.E.3d 1242, 1257 n.12 (Mass. 2015) (quoting Jed Handelsman Shugerman, *The Golden or Bronze Age of Judicial Selection?*, 100 Iowa L. Rev. Bull. 69, 74 (2015)).

¶17 The U.S. Supreme Court applied the First Amendment to limit the scope of state defamation liability in the context of public affairs in *New York Times*. Under state tort law, certain damaging and inaccurate statements made about a public official were deemed to establish defamation. 376 U.S. at 267. But the Court held that to protect against chilling criticism of public officials, the First Amendment also required a showing that the statements were made with "actual malice." *Id.* at 279–80.

¶18 Subsequent decisions have further defined the scope of permissible defamation liability regarding public figures and matters of public concern. In *Greenbelt*, a newspaper reported that at city council meetings, members of the public referred to a local developer's negotiating position with the city over a controversial project as "blackmail." 398 U.S. at 7–8. The developer sued the newspaper for libel, asserting that the statements implied he had committed the crime of blackmail. *Id.* at 8.

¶19 Though such a complaint might be actionable under state defamation law, the Court in *Greenbelt* held the statements, considered in their context, were insulated by the First Amendment as a matter of law. *Id.* at 13. "Because the threat or actual imposition of pecuniary liability for alleged defamation may impair . . . First Amendment freedoms," the Court stated that "the Constitution imposes stringent limitations upon the permissible scope of such liability." *Id.* at 12. Weighing the words in context, the Court concluded that "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the developer] Bresler with the commission of a criminal offense." *Id.* at 14. Rather, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." *Id.* Thus, an assertion that ordinarily could bear a defamatory meaning, and that could be proven false, was deemed nonactionable under the First Amendment because the context

demonstrated, as a matter of law, that it was a hyperbolic comment made during a charged public hearing on a matter of public concern.

¶20      In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Court considered a case in which a high school wrestling coach brought a libel action against a publication that allegedly implied he had committed perjury. The Court held there is no wholesale exemption for statements of opinion in defamation cases, *id.* at 18, but that statements on matters of public concern must be provable as false in order for liability to occur under state defamation law, *id.* at 19. The Court ruled that as to defamatory opinions made against private figures on matters of public concern, "a plaintiff must show that the false connotations were made with some level of fault," *id.* at 20, and that there must be "enhanced appellate review" to assure that those determinations are made in a manner that does not chill free expression, *id.* at 21 (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

¶21      The Court in *Milkovich* considered an opinion piece titled "Maple beat the law with the 'big lie.'" *Id.* at 4. The article in its entirety was about the coach, identified by name, and the superintendent, who testified at a court hearing. *Id.* at 3–5. The Court concluded that the article's caption and nine sentences were actionable because they clearly implied that the coach had committed perjury, an assertion that was provable as false. *Id.* at 21.

¶22      This Court addressed these issues in *Yetman*, in which it held actionable a defamation claim by a county supervisor against a state legislator who, speaking about the supervisor at a political party meeting, asked, "What kind of communist do we have up there that thinks it's improper to protect your interests?" 168 Ariz. at 73. Applying *Milkovich*, the Court held, as pertinent here, that to establish a defamation claim on matters of public concern: (1) the assertion must be provable as false; (2) the statement must be reasonably perceived as stating actual facts about an individual, rather than imaginative expression or rhetorical hyperbole; and (3) the determination of those questions is subject to enhanced appellate review.[1] *Id.* at 75–76. The Court went on to conclude that those three

---

[1] The Court also applied the *New York Times* "actual malice" standard, 376 U.S. at 279–80, which is inapplicable here as Young is not a public figure.

criteria were satisfied under the facts presented, allowing the defamation action to proceed.[2]  *Id.* at 81–82.

**¶23**        *Yetman* articulated well the important gatekeeper role courts must play in safeguarding First Amendment principles in the defamation context, declaring that "only in the clearest cases may courts, applying the principles laid down in *Milkovich*, determine as a matter of law that the assertions before them state or imply actual facts and are therefore entitled to no constitutional protection."  *Id.* at 79.  Thus, "it will be necessary for courts to carefully examine every alleged defamatory statement . . . to ensure that first amendment concerns are protected.  This examination must ensure that the matter is left to the jury only where there are truly two tenable views or interpretations of the statement."  *Id.*

**¶24**        Some courts have added even greater specificity to determinations that must be made in defamation cases involving public figures or issues of public concern.  In *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1050 (9th Cir. 1990), the Ninth Circuit considered an action against a television commentator who asserted that a particular product "didn't work."  The court developed a three-part test for determining whether an assertion is a statement of fact: (1) whether a defendant used figurative or hyperbolic language that negated the impression that the statement was a serious factual assertion, (2) whether the general tenor of the message as a whole negated that impression, and (3) whether the assertion is susceptible of being proved true or false.  *Id.* at 1053.

**¶25**        The District of Columbia Circuit, recognizing that defamation by implication is a step beyond direct defamatory statements, applies an intent standard in such cases.  In *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990), the court held that "if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established." "But if the communication, by the particular manner or language in which

---

2  Although we apply the *Yetman* framework, it is difficult to credit its outcome, especially given how political discourse has devolved over the past three decades.  Terms that once conveyed powerful invective such as "communist," "socialist," "fascist," and even "traitor" are commonplace in current political discourse, cheapening their pejorative impact and becoming almost synonymous with "someone with whom I disagree."

the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning." *Id.*

¶26　　　　We need not go beyond U.S. Supreme Court or our own jurisprudence to resolve this case, and therefore we decline to adopt either *Unelko* or *White*. But both cases are instructive. *Unelko* teaches (as does *Greenbelt*) that context is important in determining whether a statement is a genuine factual statement or rhetorical hyperbole. *White* demonstrates that defamation by implication—that is, where the actual spoken or written words are materially true but give rise to a palpable inference—presents special concerns in discussions about public affairs. We take those lessons into account as we apply below the applicable First Amendment framework to the facts of this case.

¶27　　　　Doing so requires acknowledging that if there is a garden-variety defamation claim involving a matter of public concern, this is not it. We are unable to identify, and the parties did not supply, any other case presenting third-party defamation by implication. As a result, this case, even more than most, calls upon us to perform the enhanced appellate role necessary to ensure that core First Amendment values are protected, and thus to examine with great care the statement at issue, the context in which it was made, and the implication it allegedly generated.

## C.

¶28　　　　Certain baseline facts that are relevant to our determination were established over the course of the litigation to date. First, Young is a private figure, and therefore the *New York Times* "actual malice" standard, 376 U.S. at 279–80, is not applicable. Second, Rogers concedes that it is widely known that Smith was employed by Young, so that the reference to "Smith . . . whose agency" in the advertisement could be taken by at least some listeners as referring to Young.

¶29　　　　At the same time, Young does not dispute the factual accuracy of the statement at issue: "Smith is a slimy character whose modeling agency specializes in underage girls and advertises on websites linked to

sex trafficking."[3] Ordinarily, that concession would command a hard-stop to the litigation, as "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

¶30 Instead, Young argues that it is the statement's implication—which she asserts is that Young is complicit in sex trafficking children—that is defamatory. A mere implication derived from a concededly factual statement is a significant step removed from a statement that is expressly defamatory, requiring us to ensure that the implication is clear and fully capable of being proved false. *Cf. White*, 909 F.2d at 520 (applying heightened scrutiny to allegations of defamation by implication). The First Amendment does not permit us to indulge the plaintiff's "intensely subjective evaluation" of the meaning and falsity of a statement. *Turner v. Devlin*, 174 Ariz. 201, 207 (1993) (relying on *Milkovich*). Rather, we must objectively determine the statement's "natural and probable effect on the mind of the average recipient." *Yetman*, 168 Ariz. at 77.

¶31 Even in a defamation case involving only matters of private concern, our task is to examine the alleged defamatory statement in its context. Restatement § 563 cmt. d. That requirement is even more important when we are dealing with a matter of public concern, where we seek to ensure that First Amendment freedoms are not abridged. Indeed, context may well be dispositive. *Compare Greenbelt*, 398 U.S. at 14 (holding that the term "blackmail" in the context of a heated public meeting was hyperbole), *with Milkovich*, 497 U.S. at 3–5 (finding the entire column and its headline were directed entirely toward the conclusion that the coach committed perjury).

¶32 Although it is important that the advertisement occurred in the context of a bitterly fought political campaign, we will not look beyond the advertisement to consider the broader themes of the Rogers campaign, as the court of appeals did. *See Rogers*, 250 Ariz. at 333 ¶¶ 56–57

---

[3] As the court of appeals noted, the term "specializes in underage girls" necessarily bears a negative connotation, as definitions of "underage" would suggest that the models are below some sort of legal or proper age. *Rogers*, 250 Ariz. at 329 ¶ 39. Young could possibly have challenged this part of the statement as false and damaging, and therefore defamatory.

(considering the campaign's overall strategy of undermining Smith's portrayal as a family-values candidate). We do not expect that a reasonable listener would research an overall campaign strategy in order to determine the meaning of a specific advertisement.[4] But we must view the statement within the entirety of the publication, as the meaning or implication is only fully apparent in context. That is certainly the case here, as the advertisement in its totality makes quite clear that Steve Smith is the exclusive *raison d'etre* for the attack.

¶33 Indeed, Young embraces hyperbole of her own when she contends she is "center stage" in the advertisement. Quite the contrary; she is off-stage and makes an appearance, if at all, only to those who recognize that Smith's agency is Young Agency, or who are impelled to research to whom the agency belongs. And even then, the appearance is a supporting role, with the spotlight firmly fixed on Smith.

¶34 The entire radio advertisement is 132 words long. The contested statement consists of twenty words—or fifteen, if the words "Smith is a slimy character" are excised. Smith is mentioned in the advertisement four times; of course, Young is not mentioned by name at all. Indeed, the insinuation is that the agency belongs to Smith ("Smith . . . whose agency"), so much the better to paint him as slimy. The sole instance in which anyone other than the opposing candidate is identified is when the advertisement talks about Rogers and the fact that she paid for it, establishing exactly what the advertisement is: an attack ad aimed at Steve Smith. Although Young technically satisfies the state defamation law requirement that the statement pertains to her, her actual connection with the advertisement is attenuated. *See, e.g.*, *AMCOR Inv. Corp. v. Cox Ariz. Publ'ns, Inc.*, 158 Ariz. 566, 570–71 (App. 1988) ("[I]t is important here that the primary target of Jennings' ire was the city council, not AMCOR.").

¶35 That the statement is challenged not on its express terms, but by its asserted implication, makes it doubly attenuated. The nature of

---

[4] Nor do we believe, contrary to the court of appeals' suggestion, *id.* at 330 ¶ 43, that expert testimony is necessary, or even particularly useful, to establish a statement's meaning or implication given that jurors are capable of discerning a reasonable listener's understanding. *See* Ariz. R. Evid. 702(a) (permitting expert testimony to "help the trier of fact to understand the evidence or to determine a fact in issue").

defamation by implication is that the express words are true, but a secondary meaning is false. It is inherently difficult to prove the falsity of an implication—as is required by the First Amendment on matters of public concern, *see, e.g.*, *Milkovich*, 497 U.S. at 16; *White*, 909 F.2d at 520—because an implication necessarily lies in the eyes of the reader or the ears of the listener.

¶36 Here, the implication of the reference to Smith's agency, viewed in isolation, could be a number of things, including the meaning Young suggests. But Rogers leaves the implication neither to the intelligence nor imagination of the listener. She supplies it with the prefacing words, "Smith is a slimy character." Those words are crucial for two reasons. First, they identify Smith, and not Young, as the target of the advertisement, which is consistent with the advertisement as a whole. Second, and more importantly, the assertions about the agency are used to corroborate the stated charge: not that Smith is complicit in sex trafficking, but that he is slimy (a charge that as applied to a human or a business is, of course, incapable of being proved true or false). It is extraordinarily difficult to credit the assertion that the exact same words that are used to demonstrate that Smith is slimy also imply that Young is complicit in sex trafficking. Yet that proposition is essential to Young's defamation theory.

¶37 The dissenters respond they are mystified because "[t]he only way the contested statement paints Smith as 'slimy' is if the listener understands it as meaning Young Agency, his employer, is complicit in sex trafficking girls." *Infra* ¶ 46. That is flatly wrong. The advertisement is more reasonably understood to imply that Smith is "slimy" because he makes a living off exploiting children as models and goes so far as to advertise his sketchy business on questionable websites. That is a far cry from any reasonably understood inference that the agency itself is engaged in sex trafficking girls. Sex trafficking girls makes one a criminal. Making a living in a seedy business makes one "slimy," which is exactly what the advertisement alleges that Smith does.

¶38 The assertion that the contested statement implies that Young is complicit in sex trafficking is simply too remote to infer on behalf of a reasonable listener in the context of an attack ad directed toward a specific named individual that aims to prove he is slimy. It is especially untenable in light of the First Amendment's protection of political speech. At worst,

13

it is "the sort of loose, figurative, or hyperbolic language which would negate the impression" that Rogers was "seriously maintaining" that Young was complicit in sex trafficking. *Milkovich*, 497 U.S. at 21. To allow a defamation action to proceed where the publication is a political advertisement directed at an opposing candidate, where the plaintiff is unnamed in the publication, where the challenged statement is conceded to be true, and where the alleged offending implication is not obvious, would not only chill free speech in this case but also open the floodgates to litigants who are aggrieved by perceived indignities visited upon them by politicians.

¶39     Were we to allow this claim to proceed, any third party who might indirectly be identified in a passing reference in a political advertisement (a business's patrons or an official's inner circle, for instance), would have a cause of action if a possible damaging implication could be inferred from an otherwise factually accurate statement, even if the overall advertisement (as here) was clearly aimed at a political opponent. Young's counsel identified no limiting principle for such a theory, nor can we perceive any.

¶40     The only backstop in such instances would be the jury, whose good judgment can ordinarily be counted on to ferret out true instances of defamation. But a jury's charge, unlike ours, does not include safeguarding freedom of speech. *See Yetman*, 168 Ariz. at 79 (stating that defamation case may proceed to the jury "only where there are truly two tenable views" of the statement at issue); *cf. Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (recognizing that a jury's ability to make subjective determinations in a state tort lawsuit is in tension with the "special protection" the First Amendment provides to speech about public affairs). Moreover, allowing the claim to proceed, even if it ends in a verdict for the defendant, exposes the candidate to costly litigation and potentially embarrassing discovery. Recognizing a claim of third-party defamation by implication in the context of public debate, where the challenged statement is conceded to be true and the alleged offending implication is not obvious, would therefore inevitably and intolerably chill political speech.

¶41     None of this is meant to disparage Young's grievance. She asked to stay out of the fray. It is not uncommon for friends, family, supporters, and professional associates of candidates and public figures to

be swept involuntarily into the political maelstrom, and it is essential for defamation remedies to be available in meritorious cases. But "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.'" *Boos v. Barry*, 485 U.S. 312, 322 (1988) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988)). The claim here is simply too attenuated to be actionable without inflicting a serious chilling effect upon important, even if repugnant, political speech.

¶**42**       As the complaint fails to allege "specific facts showing a genuine issue for trial," Ariz. R. Civ. P. 56(e), we remand the matter to the trial court to grant summary judgment for the defendants. We vacate the opinion of the court of appeals.

TIMMER, VCJ., joined by BRUTINEL, CJ., and ESPINOSA, Judge., dissenting.

¶43        In its zeal to shelter political mudslinging under First Amendment freedoms, the majority abandons private individuals caught in the crossfire and effectively displaces the jury in cases involving implied defamation against unnamed, yet readily identifiable, people.  Because Rogers' radio advertisement here permitted a reasonable factfinder to conclude that it implied as a matter of actual fact that Young Agency was complicit in sex trafficking girls, a fact provable as false, the trial court properly denied Rogers' motion for summary judgment.

¶44        A defamatory communication brings another person into "disrepute, contempt, or ridicule" or impeaches a person's "honesty, integrity, virtue, or reputation." *Turner v. Devlin*, 174 Ariz. 201, 203–04 (1993) (quoting *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341 (1989)). An allegedly defamatory communication—express or implied—about a private person, but involving matters of public concern, is actionable when the challenged statements, considering their content and context, (1) could reasonably be interpreted as stating actual facts about the person, which (2) are provable as false. *See Yetman v. English*, 168 Ariz. 71, 75 (1991) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 20 n.6 (1990)); *Turner*, 174 Ariz. at 204.  If so, the defamed person must show by a preponderance of evidence that the speaker knew the statement was false and defamed him or her, acted in reckless disregard of those circumstances, or acted negligently in failing to ascertain them. *See Peagler v. Phx. Newspapers, Inc.*, 114 Ariz. 309, 315 (1977); Restatement (Second) of Torts § 580B (Am. Law Inst. 1977).

¶45        The issue here is whether the radio advertisement's pronouncement—"Smith is a slimy character whose modeling agency specializes in underage girls and advertises on websites linked to sex trafficking"—could reasonably be understood by at least one listener as implying as a matter of actual fact that Young Agency was complicit in sex trafficking girls. *See Yetman*, 168 Ariz. at 76 (noting "[t]he key inquiry is whether the challenged expression, however labeled by defendant, would

16

reasonably appear to state or imply assertions of objective fact" from the perspective of a reasonable person (emphasis omitted) (quoting *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1273–74 (N.Y. 1991))); *see also* Restatement § 564 cmt. b (explaining it is sufficient if one recipient of the communication reasonably understands to whom it is referring). The majority acknowledges that some listeners could understand the contested statement as meaning Young Agency was complicit in sex trafficking girls, indisputably a defamatory communication. *See supra* ¶¶ 28, 33–34, 36. It nevertheless concludes, as a matter of law, that because the advertisement targeted Smith as "slimy," and the assertion against Young Agency only corroborated this hyperbolic characterization, a reasonable person could not have understood the advertisement as meaning Young Agency was complicit in sex trafficking. *See supra* ¶¶ 37–38.

¶46 The majority's reasoning strains logic and, frankly, mystifies us. If a reasonable person could not have understood the advertisement as meaning Young Agency was complicit in sex trafficking, the assertion against the agency could not have corroborated Rogers' characterization of Smith as "slimy." What was the point of mentioning the agency? The only way the contested statement paints Smith as "slimy" is if the listener understands it as meaning Young Agency, his employer, is complicit in sex trafficking girls.

¶47 The majority cites no authority for its position that a campaign advertisement, and presumably any communication, cannot, as a matter of law, defame a third party who is not the advertisement's primary target. There is none. The communication need only be "of and concerning" the third party. *See Hansen v. Stoll*, 130 Ariz. 454, 458 (App. 1981); Restatement § 564. Here, both Rogers and the majority concede that the challenged language in the radio advertisement was "of and concerning" Young Agency because it was widely known the agency employed Smith. *See supra* ¶ 28. Indeed, Rogers' website itself, slimysteve.com, stated Smith was a director at Young Agency. *See* Restatement § 564 cmt. b ("Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.").

17

¶48 The trial court here properly denied the summary judgment motion. A reasonable factfinder could conclude, as the majority suggests, that the statement concerning Young Agency was merely political invective, which would be privileged under the First Amendment. *See Yetman*, 168 Ariz. at 77. But it could also conclude that the statement implied as an assertion of actual fact that Smith's agency—Young Agency—was complicit in sex trafficking girls, which would not be privileged. *See id.* Although the facts regarding the agency may have been accurate, the presentation of those facts—stating Smith was "slimy" because he worked there, using the term "underage girls" to insinuate they were not legally permitted to engage in the agency's modeling assignments, and stating the agency advertised on websites linked to sex trafficking—implied as a matter of actual fact that Young Agency was complicit in sex trafficking, a matter capable of being proved false. *See id.* at 75–76.

¶49 The majority supplants the jury's role in deciding factual issues like the one here fearing a limitless barrage of lawsuits against candidates for defamatory implications in campaign communications, that juries won't safeguard the First Amendment, and that candidates' speech might be chilled out of concern for "costly litigation and potentially embarrassing discovery." *See supra* ¶¶ 38–40. But these concerns don't justify removing this and like cases from juries. The *Milkovich* protections, *see supra* ¶¶ 20–22, which we apply in this dissent, are "adequate to ensure that debate on public issues remains 'uninhibited, robust, and wide open.'" *Yetman*, 168 Ariz. at 75 (quoting *Milkovich*, 497 U.S. at 20). But when "reasonable people might clearly give conflicting interpretations" to challenged communications, "the question must be left to the jury." *Id.* at 79; *see also* Restatement § 617 (stating that subject to the court's normal controls, "the jury determines whether (a) the defamatory matter was published of and concerning the plaintiff; (b) the matter was true or false; and (c) the defendant had the requisite fault in regard to the truth or falsity of the matter and its defamatory character"). That is the situation here.

¶50 In short, the majority today largely bars claims for implied defamation against private parties in political campaigns because political opponents, not private parties, will usually, if not always, be the targets of political speech. This view effectively weaponizes the First Amendment against innocent bystanders ensnared by often-vitriolic political campaigns,

18

disregards well-established precedent, and is unnecessary for protecting political speech.  We respectfully dissent.