IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SEYED MOSHEN SHARIFI TAKIEH M.D., *Plaintiff/Appellant*,

*v.*

MICHAEL O'MEARA M.D., et al., *Defendants/Appellees*.

No. 1 CA-CV 20-0290
FILED 8-10-2021

Appeal from the Superior Court in Maricopa County
No. CV 2018-001473
The Honorable Christopher T. Whitten, Judge

**AFFIRMED**

COUNSEL

William A. Miller PLLC, Scottsdale
By William A. Miller, Stephen D. Smith
*Counsel for Plaintiff/Appellant*

Papetti Samuels Weiss LLP, Scottsdale
By Jared L. Sutton, Randall S. Papetti
*Counsel for Defendants/Appellees, Michael O'Meara M.D., James Del Giorno
M.D., Tri-City Cardiology*

Coppersmith Brockelman PLC, Phoenix
By Andrew S. Gordon, Katherine L. Hyde, Karen C. Owens
*Counsel for Defendants/Appellees Janice Dinner, Michael O'Connor M.D.*

---

**OPINION**

---

Judge Jennifer B. Campbell delivered the opinion of the Court, in which Presiding Judge D. Steven Williams and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1 Dr. Seyed Mohsen Sharifi Takieh ("Sharifi") appeals the superior court's entry of summary judgment in favor of Dr. James Del Giorno and Janice Dinner on his defamation claims. He also challenges two of the court's discovery rulings and its award of attorneys' fees against him. We conclude the court properly entered summary judgment and, because statements derived from a peer-review process are privileged, the superior court properly precluded Sharifi's discovery requests under A.R.S. § 36-445.01. We also affirm the court's attorneys' fees award.

**BACKGROUND**

¶2 For more than a decade, Sharifi, a cardiologist, maintained active medical staff membership and clinical privileges at Banner Baywood Medical Center ("Baywood") in Mesa. His good standing and affiliation with Baywood ended, however, when Baywood's Medical Executive Committee ("MEC"), a peer-review body, voted to restrict his practice and the Banner Health Board of Directors voted to revoke his clinical privileges.

¶3 Amidst these adverse actions, Sharifi filed a complaint alleging various claims against several individuals involved in the peer-review process. The defendants moved to dismiss the complaint, primarily arguing they were immune from liability for any claims arising out of peer-review proceedings. *See* A.R.S. § 36-445.02 (A), (B) (immunizing from "liability for civil damages or legal action" any participant in a medical peer-review proceeding who "makes a decision or recommendation" or "furnishes any records, information, or assistance" to "medical staff or review committee or related organization").

¶4 The superior court granted the motions to dismiss "in large part," reasoning that the defendants were immune from liability under A.R.S. § 36-445.02 for actions taken and statements made during peer-

review proceedings.[1] With respect to the remaining claims, the court allowed Sharifi to file an amended complaint. In the amended complaint, Sharifi alleged claims against Del Giorno and Dinner for defamation, injurious falsehood, intentional interference with contract, and conspiracy. Sharifi premised each claim on the same two assertions: (1) Del Giorno, Baywood's chair of cardiology, made damaging false statements when he told another cardiologist that Sharifi "is an idiot" who administered blood thinner "to an obvious case of intracerebral hemorrhage," and (2) Dinner, Banner Health's senior associate general counsel, composed "letters and various other documents and communications" containing "defamatory material . . . designed to destroy his reputation in the medical community."

¶5          In their answers, neither defendant denied making the alleged statements. Del Giorno, however, asserted that to the extent he made any assertions of fact, they were true, and that otherwise, his statements were merely opinion, and therefore not actionable. Dinner, in turn, maintained that she was immune from liability because her actions "were done as part of and within" protected peer-review proceedings. *See* A.R.S. § 36-445.02 (A), (B).

¶6          As the litigation progressed, Sharifi moved to compel Dinner to disclose, among other things: (1) Baywood's investigation of sexual-harassment allegations made against him, (2) his personnel/credentialing file, and (3) correspondence Dinner sent or received concerning him. After oral argument, the court ruled that documents in Sharifi's file pertaining to his credentials and the sexual-harassment allegations were protected from disclosure by the peer-review privilege and Dinner was not required to create a privilege log listing them. With respect to the request for any documents/communications Dinner authored or received concerning Sharifi, the court ordered Dinner to produce the documents or a privilege log identifying "any that are claimed to be privileged."

¶7          After the close of discovery, Dinner and Del Giorno moved for summary judgment. In response, Sharifi moved for the appointment of a special discovery master to review the documents Dinner had withheld, asserting that Dinner had failed to comply with the disclosure order. As detailed by Sharifi, Dinner withheld all the documents he had sought and had failed to produce a log, saying only that she had reviewed her emails and determined that all the requested correspondence constituted protected peer-review materials. Attached to his motion, Sharifi disclosed,

---

[1]          On appeal, Sharifi does not challenge the superior court's dismissal order.

for the first time, the affidavits of two former Baywood employees: Leslie Wilson, a cardiac sonographer, and Dr. Ava Rose, an internist. Wilson avowed that she witnessed Dinner speaking on a cell phone and overheard her make several disparaging remarks about Sharifi, including that he is a terrible doctor, a danger to his patients, and an idiot. Rose, in turn, avowed that she overheard three physicians discussing their testimony against Sharifi in the peer-review proceedings and recounted that they said Dinner had encouraged them to make false statements and assured them that they would have immunity for their participation. In response, Dinner moved to strike both affidavits as untimely.

¶8        The superior court denied Sharifi's motion for appointment of a special discovery master, finding no evidence to suggest that any of the correspondence at issue "originated outside the peer review process." The court also struck the Rose and Wilson affidavits as untimely.

¶9        After full briefing, the superior court entered summary judgment in favor of Del Giorno and Dinner. The court explained that even assuming Del Giorno made the alleged statements to his fellow cardiologist, there was no dispute that Sharifi had, in fact, administered blood thinner to a patient who had an intracerebral hemorrhage. Further, concluding that the "characteriz[ation]" of Sharifi's conduct "as idiotic" was "nothing more" than a "subjective impression," the court found Del Giorno's alleged "assessment" was not an actionable statement of fact. Turning to the allegations against Dinner, the court found that Sharifi had failed to produce *any* admissible evidence showing that Dinner "made any comments about him, defamatory or otherwise, outside the context of [protected] peer review activities."

¶10        Having prevailed on summary judgment, Dinner requested an award of attorneys' fees under A.R.S. § 12-349, asserting that Sharifi brought the defamation claim against her without substantial justification and primarily for harassment. The court agreed and awarded Dinner $128,878.00 in attorneys' fees and $1,444.92 in taxable costs, finding no evidence to suggest that when Sharifi filed his amended complaint, he "had a good faith belief" that Dinner had made any defamatory statements about him that were not protected by the peer-review privilege. The court reduced its rulings to a final judgment, and Sharifi timely appealed.

4

**DISCUSSION**

## I.      Summary Judgment Rulings

¶11      "The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). In reviewing a grant of summary judgment, we view the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party and will affirm "if the evidence produced in support of the defense or claim has so little probative value that no reasonable person could find for its proponent." *State Comp. Fund v. Yellow Cab Co. of Phoenix*, 197 Ariz. 120, 122, ¶ 5 (App. 1999). "We review de novo the [superior] court's application of the law and its determination whether genuine issues of material fact preclude summary judgment." *Id.*

### A.      Defamation Claim Against Del Giorno

¶12      Sharifi argues the court erred in dismissing his defamation claim against Del Giorno because Del Giorno's statements about him conveyed assertions of fact that were both false and damaging.

¶13      The right to free speech, enshrined in the First Amendment, is not absolute —"[s]ociety has a pervasive and strong interest in preventing and redressing" defamatory speech. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990) (citation and internal quotation omitted). Nonetheless, because "the expense of defending a meritless defamation case" can have "a chilling effect on First Amendment rights," *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 357 (1991), "the superior court must act as gatekeeper protecting the right to free speech" from encroachment. *Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 102, ¶ 1 (App. 2017); *see also Yetman v. English*, 168 Ariz. 71, 79 (1991) ("Given the rigorous scrutiny required by the first amendment," the court must "carefully examine every alleged defamatory statement . . . to ensure that first amendment concerns are protected.").

¶14      To support a claim for defamation, a statement about a private figure on a matter of private concern "must be false" and must bring the subject of the statement "into disrepute, contempt, or ridicule" or impeach the subject's "honesty, integrity, virtue, or reputation." *Turner v. Devlin*, 174 Ariz. 201, 203–04 (1993) (quoting *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341 (1989)). While any disparaging statement can cause reputational harm, a true statement cannot support a claim for defamation. *Read*, 169 Ariz. at 355.

¶15        In fulfilling its gatekeeping role, the superior court first must determine "whether, under all the circumstances, a statement is capable of bearing a defamatory meaning." *Yetman*, 168 Ariz. at 79 (citing Restatement (Second) of Torts § 614 (1977)). As a matter of law, a statement is not actionable if it is comprised of "loose, figurative, or hyperbolic language" that cannot reasonably be interpreted as stating or implying facts "susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21. In a case such as this, "[t]he key inquiry is *whether the challenged expression*, however labeled by defendant, *would reasonably appear to state or imply assertions of objective fact*." *Yetman*, 168 Ariz. at 76 (citation and internal quotation omitted). In this determination, the court should "'*consider the impression created by the words used as well as the general tenor of the expression, from the point of view of a reasonable person*' at the time the statement was uttered and under the circumstances it was made." *Sign Here Petitions*, 243 Ariz. at 105, ¶ 21 (quoting *Yetman*, 168 Ariz. at 76).

¶16        While statements cast as subjective beliefs are generally insulated from defamation liability, "statements of opinion *are* actionable when they imply a false assertion of fact." *Turner*, 174 Ariz. at 208 (internal quotation omitted and emphasis added). In other words, if a statement of opinion may be proven false, "it is actionable as defamatory," *Dube v. Likins*, 216 Ariz. 406, 419, ¶ 46 (App. 2007), but a statement is not actionable if it does not present "the kind of empirical question a fact-finder can resolve," *Yetman*, 168 Ariz. at 81. Finally, "[t]o defeat a defendant's motion for summary judgment in a defamation case, the plaintiff must present evidence 'sufficient to establish a prima facie case with *convincing clarity*.'" *Sign Here Petitions*, 243 Ariz. at 104, ¶ 14 (citation omitted).

¶17        With these principles in mind, we consider Del Giorno's alleged statements. To prove his defamation claim against Del Giorno, Sharifi relied primarily on the declaration of Dr. Suzanne Sorof, a cardiologist. As detailed in her brief statement, Sorof saw and heard Del Giorno talking to another cardiologist through a partially open door. She recounted that Del Giorno stated: "Sharifi is an idiot. We finished his venous career here and won't let it continue anywhere at Banner. He gave tPA to an obvious case of intracerebral hemorrhage." From Del Giorno's tone and demeanor, Sorof concluded that he was "angry."

¶18        Addressing the alleged falsity of Del Giorno's statements, Sharifi neither denied that he administered blood thinner to the patient nor that she had an intracerebral hemorrhage. He argued instead that he was not an "idiot" and that the patient's hemorrhage was not obvious at the time. In support, he asserted that he had an expert who would testify that

a CT scan of the patient "complete[ly] negated" the "possibility" of a hemorrhage and that "no physician could interpret [the patient's] chart – at the time [] Sharifi administered tPA – in such a manner as to indicate that [the patient's] condition was 'obvious.'"

¶19　　　　Viewed in context, Del Giorno's "angry" statement to a fellow physician that Sharifi is "an idiot" clearly did not suggest that Sharifi, a board-certified specialist in cardiovascular medicine, suffers from an extreme intellectual disability, as the term "idiot" was historically used in both medical and educational settings. *See Idiot*, Merriam-Webster, https://www.merriam-webster.com/dictionary/idiot (last visited August 4, 2021). Instead, consistent with the modern understanding of the word and common usage, Del Giorno was expressing his *belief* that Sharifi acted foolishly. *See id.* (defining "idiot" as "a foolish or stupid person"). Because assessments like these of foolishness or stupidity are subjective determinations, there is no means to establish their truth or falsity. In other words, a statement that someone is an idiot is inherently a statement of opinion, not objective fact. *See Steinhausen v. HomeServices of Nebraska, Inc.*, 857 N.W.2d 816, 828 (Neb. 2015) (concluding that the term "idiot" is a "subjective impression[]" that "cannot be defamatory"). Therefore, we agree with the superior court that Del Giorno's "idiot" statement is not actionable as a matter of law because it does not present "the kind of empirical question a fact-finder can resolve." *Yetman*, 168 Ariz. at 81.

¶20　　　　Turning to Del Giorno's description of the patient's hemorrhage as "obvious," we apply a similar analysis. Whether something is *easily* perceived or understood is a matter of opinion. *See Obvious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/obvious (last visited August, 2021) (defining "obvious" as "easily discovered, seen, or understood"). Had Del Giorno told his colleague that the patient's hemorrhage was diagnosed, documented, or otherwise confirmed, he would have been stating a matter of objective fact, provable as true or false. Instead, he expressed his *belief* that the hemorrhage should have been readily apparent. To refute Del Giorno's assertion, Sharifi asserted his expert would testify that a reasonable doctor would not have detected the patient's hemorrhage before administering a blood-thinner medication. The nature of the *opinion* evidence Sharifi asserted he could offer *to prove defamation* belies one of the tort's requisite elements—the utterance of a statement of *fact*. Moreover, as Del Giorno points out, the overall impression of his words, including his alleged angry tone and use of the term "idiot," would not lead a reasonable listener to believe that he was making a statement of verifiable, medical fact. Because the record on summary judgment lacked clear and convincing

evidence that a reasonable listener could have understood Del Giorno's "obvious" statement as conveying an objective fact, the superior court properly entered summary judgment dismissing Sharifi's defamation claim against him.

### B. Defamation Claim Against Dinner

¶21 Sharifi also challenges the dismissal of his defamation claim against Dinner, contending that he failed to carry his burden to establish a prima facie case only because the superior court erroneously (1) relieved Dinner of her obligation to disclose email communications concerning him, and (2) struck the Wilson and Rose declarations.

### 1. Disclosure Ruling Regarding Emails

¶22 After the superior court made its initial disclosure order, Dinner responded that she had reviewed her email correspondence and found 738 emails concerning Sharifi. Although Dinner determined most of the emails were privileged attorney-client communications, she did not create a privilege log because she concluded *all* the emails were prepared in connection with peer-review proceedings that she contended were protected from discovery by A.R.S. § 36-445.01(A). Finding no evidence to "suggest that any of the 738 documents at issue originated outside the peer review process," the court denied Sharifi's request for the appointment of a special discovery master to review each of the emails in camera.

¶23 On appeal, Sharifi asserts that the superior court's approach "allow[ed] Dinner to unilaterally determine that the peer review protection applied to large categories of unidentified documents (including her own personal emails)." In other words, without a privilege log or in camera review of the documents, Sharifi argues he had no "means to challenge" Dinner's contention that the emails were, in fact, prepared or received in connection with peer-review proceedings.

¶24 Although superior courts have broad discretion in resolving discovery disputes, *Am. Family Mut. Ins. v. Grant*, 222 Ariz. 507, 511, ¶ 11 (App. 2009), whether a disclosure obligation exists or a privilege applies is a question of law that we review de novo. *Solimeno v. Yonan*, 224 Ariz. 74, 77, ¶ 9 (App. 2010); *Ledvina v. Cerasani*, 213 Ariz. 569, 571, ¶ 3 (App. 2006). Under Arizona Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."

¶25　　　　State law requires peer review of physicians in Arizona hospitals. To "reduc[e] morbidity and mortality" and improve "the care of patients," each Arizona hospital or surgical center "shall require that physicians admitted to practice in the hospital or center organize into committees . . . to review the professional practices within the hospital or center," including "the preventability of complications and deaths." A.R.S. § 36-445. By statute, the participants in these mandated peer-review committees are immune from liability "to any person who is denied the privilege to practice in a hospital or center or whose privileges are suspended, limited or revoked." A.R.S. § 36-445.02(B). As further protection, "[a]ll . . . materials prepared in connection with" peer-review proceedings are privileged and confidential and therefore "not subject to discovery." A.R.S. § 36-445.01(A).

¶26　　　　"Arizona courts have recognized that the confidentiality of peer review committee proceedings is essential to achieve complete investigation and review of medical care." *Humana Hosp. Desert Valley v. Superior Ct.*, 154 Ariz. 396, 400 (App. 1987). Because peer-review deliberations would be substantially compromised "if they were subject to the discovery process," the peer-review privilege must remain inviolate. *Id.*; *Goodman v. Samaritan Health Sys.*, 195 Ariz. 502, 509, ¶ 27 (App. 1999) ("If effective peer review is to be achieved, and the statutory goal [of reducing morbidity and mortality and improving patient care] realized, peer reviewers and their hospitals must have some protection against money damage claims.").

¶27　　　　While materials created outside the peer-review process that "do not contain references" to peer-review proceedings are discoverable, "the internal workings and deliberative process" of peer-review committees are "immune from discovery." *Humana*, 154 Ariz. at 403. Accordingly, "a plaintiff is not entitled to engage in a fishing expedition to ascertain what information was considered by the peer review committee where such information might reveal the deliberative process of the participants." *Yuma Reg'l Med. Ctr. v. Superior Ct.*, 175 Ariz. 72, 77 (App. 1993).

¶28　　　　We find *Yuma Regional* particularly instructive here. In that case, the plaintiffs sought information concerning the hospital's peer-review proceedings, including lists identifying each participant and each document submitted. *Id.* at 74. After the superior court ordered the hospital to furnish the plaintiffs with a redacted copy of the requested information and "to provide the court with a redacted copy and an original of the same" for in camera review, the hospital petitioned this court for relief. *Id.* at 74,

77. On special action review, we concluded the court's order that the hospital disclose the names of the peer-review participants "violate[d] the peer review privilege." *Id.* at 75–76. We further found that "requiring submission" of the requested information to the court, "in any form," also violated the privilege. *Id.* at 77.

¶29        Sharifi argues that, at a minimum, Dinner should have been required to produce a log identifying the sender and recipient of each email or other document she withheld on peer-review grounds. As Banner's general counsel, Dinner provided legal advice concerning the peer-review proceedings to both potential witnesses and the MEC members. To illustrate this point, the Rose declaration that Sharifi offered, though ultimately stricken, reflects that multiple physicians spoke with Dinner and received her legal advice regarding any potential liability for participating as witnesses in the peer-review proceedings. Because the "element of confidentiality is essential" to ensure a candid peer review, *Humana*, 154 Ariz. at 401, and given the overriding public interest in peer-review proceedings, we conclude that the superior court did not err by finding the peer-review privilege exempted Dinner from having to submit a log that would identify with whom she exchanged correspondence related to the peer-review process.[2] *Sun Health Corp. v. Myers*, 205 Ariz. 315, 319, ¶ 13 (App. 2003) ("[T]he identity of the participants in a peer review proceeding is not discoverable.").

¶30        Sharifi further contends that the superior court erred by denying his request to appoint a special discovery master to review the documents Dinner withheld to confirm that, as she asserted, each of the communications was made in connection with peer-review proceedings. As noted, in *Yuma Regional*, this court vacated a ruling mandating in camera review by the superior court of documents purportedly privileged by peer

---

[2]        Sharifi also contends that Dinner waived the peer-review privilege with respect to *all* peer-review documents by submitting five documents related to the peer-review process in support of her motion for summary judgment. We review de novo whether a party has waived a privilege. *See Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253–54, ¶ 10 (2003). The documents at issue are three letters addressed to Sharifi from a Baywood medical officer and two letters from Sharifi's attorney to Dinner. While these documents were unquestionably prepared in connection with the peer-review process, they were already in Sharifi's possession, and his contention that their "disclosure" waived the peer-review privilege in its entirety is wholly without merit.

review. Sharifi offers no argument why that principle would not likewise bar in camera review by a discovery master. Without good cause for appointment of a special master, the court did not abuse its discretion by denying Sharifi's request. *See* Ariz. R. Civ. P. 53(a)(1).[3]

## 2. Disclosure Ruling Regarding the Wilson and Rose Declarations

**¶31** Unable to rely on any documents protected by the peer-review process, Sharifi's claim against Dinner was based solely on assertions recounted in the declarations of Wilson and Rose, which he offered in response to Dinner's motion for summary judgment. The superior court struck both declarations as untimely, and Sharifi argues on appeal it erred in doing so.

**¶32** The superior court's scheduling order required the parties to disclose their non-expert witnesses by March 1, 2019 and provide any supplemental disclosure by June 28, 2019. In his initial disclosure statement, Sharifi identified Wilson as a person possessing information relevant to the case. Specifically, Sharifi disclosed that Wilson, a "former echo lab technician" at Baywood, "overheard disparaging remarks." This brief and vague description neither identified the individual who made the comments Wilson purportedly overheard nor revealed the substance of the statements, as the rules require. *See* Ariz. R. Civ. P. 26.1(a)(3) & (4).

**¶33** As the litigation progressed, Sharifi failed to provide any supplemental disclosure regarding Wilson, or *any* disclosure regarding

---

[3] Although Sharifi makes a fleeting reference to unspecified documents purportedly located in his credentialing file, asserting they are not necessarily privileged, he fails to develop that argument and does not address whether his credentialing file was used in a peer-review/credentialing process, as the superior court found. *See Humana*, 154 Ariz. at 402 ("[B]ecause the statutes expressly refer to the confidentiality of peer review of applications for staff privileges and because of the public interest in such confidentiality, we hold that the peer review privilege protects the credentialing process."). Having failed to present a reviewable argument, Sharifi has waived any issue regarding the disclosure of his credentialing file. *See* ARCAP 13(a)(7).

Rose,[4] until he filed his request for the appointment of a special discovery master, approximately two months after the disclosure deadline. In reviewing Dinner's motion to strike the Wilson and Rose declarations, the superior court found the declarations went "well beyond any previous disclosure[s]," and in the absence of a showing of good cause, the court struck them as untimely.

¶34         Rule 26.1(a)(3) requires a party to identify each witness it may use at trial. The party also must provide "a description of the substance—and not merely the subject matter—of the testimony sufficient to fairly inform the other parties of each witness' expected testimony." Ariz. R. Civ. P. 26.1(a)(3). When a party has failed to timely disclose the required information, it "may not use the information, witness, or document as evidence at trial" unless "the court specifically finds that such failure caused no prejudice or orders otherwise for good cause." Ariz. R. Civ. P. 37(c)(1). Because the superior court is in a better position to determine whether "a disclosure violation has occurred in the context of a given case" and, if so, its "practical effect," we uphold its disclosure rulings absent a clear abuse of discretion. *Solimeno*, 224 Ariz. at 77, ¶ 9.

¶35         As detailed in his complaint, Sharifi broadly alleged that Dinner sent or received communications that included defamatory statements about him. Although Sharifi had disclosed that Wilson had some information about alleged defamatory statements, he failed to disclose the substance of the statements or who made them. Given the framing of Sharifi's defamation claim against Dinner, his disclosures failed to provide her with notice that any witness directly overheard her making defamatory statements or what those statements were. Moreover, Sharifi did not seek leave of the court to use the untimely disclosed declarations by submitting an affidavit demonstrating that he disclosed the information "as soon as practicable after its discovery." *See* Ariz. R. Civ. P. 37(c)(4)(B). On this record, the superior court did not abuse its discretion by finding the Wilson and Rose declarations untimely and striking them from the record. Accordingly, because Sharifi failed to present any admissible evidence to substantiate his allegations against Dinner, much less any clear and convincing evidence, the superior court properly entered summary judgment in favor of Dinner on his defamation claim.

---

[4]      Sharifi contends he timely disclosed Rose as a witness but referred to her as Dr. Rosenblum in prior disclosures. The record reflects that Sharifi timely disclosed a 2018 affidavit from a Dr. Rosenblum, but that affidavit did not contain any of the allegations made in the Rose affidavit.

## II.     Award of Attorneys' Fees

¶36     Finally, Sharifi challenges the superior court's award of attorneys' fees to Dinner under A.R.S. § 12-349, arguing his defamation claim against her was neither groundless nor brought in bad faith.

¶37     Under A.R.S. § 12-349(A), the court "shall" assess reasonable attorneys' fees against an attorney or party who, among other things, brings a claim without substantial justification. As defined within the statute, a claim lacks substantial justification when it is both "groundless" and "not made in good faith." A.R.S. § 12-349(F). While groundlessness is determined objectively, bad faith is a subjective determination. *Rogone v. Correia*, 236 Ariz. 43, 50, ¶ 22 (App. 2014). A claim is groundless "if the proponent can present no rational argument based upon the evidence or law in support of that claim." *Id.* (citation and internal quotation omitted).

¶38     In awarding attorneys' fees under A.R.S. § 12-349, the superior court must "set forth the specific reasons for the award." A.R.S. § 12-350. Because the "purpose of this requirement is to assist the appellate court on review[,] . . . the findings need only be specific enough to allow an appellate court to test the validity of the judgment." *Bennett v. Baxter Group*, 223 Ariz. 414, 421, ¶ 28 (App. 2010) (internal quotations and citations omitted).

¶39     We review a superior court's application of A.R.S. § 12-349 de novo, but we view "the evidence in a manner most favorable to sustaining the award" and will affirm unless the superior court's findings are "clearly erroneous."[5] *Phoenix Newspapers, Inc. v. Dep't of Corr.*, 188 Ariz. 237, 243, 244 (App. 1997). We may affirm the superior court's ruling "if it is correct for any reason apparent in the record." *Forszt v. Rodriguez*, 212 Ariz. 263, 265, ¶ 9 (App. 2006).

---

[5]     Without citing any authority, Sharifi argues that we should review the superior court's findings de novo because he requested an evidentiary hearing and "was denied the opportunity to make a factual record." This contention mischaracterizes the record and is without merit. At oral argument on Dinner's request for attorneys' fees, the superior court expressly invited Sharifi to supplement the record by presenting witness testimony or written declarations, and Sharifi responded by saying he would submit supplemental affidavits. His failure to do so does not, somehow, mean he was denied the opportunity to make a factual record.

¶40        Sharifi first asserts that he brought his defamation claim against Dinner in good faith because he believed that the anti-abrogation provision in the Arizona Constitution bars peer-review participants from invoking statutory immunity under A.R.S. § 36-445.02 when sued for defamation. *See* Ariz. Const. art. XVIII, § 6 ("The right of action to recover damages for injuries shall never be abrogated."). While Sharifi correctly notes that prior cases upholding A.R.S. § 36-445.02 against anti-abrogation challenges did not consider the statute's application in defamation actions, *Goodman*, 195 Ariz. at 509, ¶ 29 n.9 (limiting the analysis upholding A.R.S. § 36-445.02 against an anti-abrogation challenge to the claims raised, explaining that "[a] different analysis might be required if a defamation claim were made against an individual peer reviewer"); *see also Humana*, 154 Ariz. at 399–400, the superior court ruled early in *this* litigation (before Sharifi filed his amended complaint) that no statement made during the peer-review process could be used to prosecute a defamation claim. Nonetheless, after receiving that ruling, Sharifi filed an amended complaint that alleged defamation against Dinner based primarily on communications made during the peer-review process. The superior court found that, at that point, Sharifi could not have had a good faith belief that any statements she made during the peer-review process could support a defamation claim against her.

¶41        The superior court found that, in the end, Sharifi offered no admissible evidence that Dinner made defamatory statements about him, made no "effort to determine whether [] Dinner actually made admissible defamatory statements about him" before filing his amended complaint, and failed "to withdraw his claim" when confronted with his lack of evidence.

¶42        During oral argument on Dinner's request for attorneys' fees, the superior court ordered Sharifi to file a signed affidavit setting forth the evidentiary basis for his amended complaint. In response, Sharifi submitted a declaration avowing that before he filed his amended complaint, several physicians privately told him that Dinner had made defamatory statements against him. According to Sharifi, these witnesses refused to execute declarations directly attributing the defamatory statements to Dinner because they feared "retaliation." Nonetheless, based on these conversations, Sharifi avowed he "firmly believed" both that his defamation claim against Dinner was "supported by the facts" and that he "could gather enough evidence to prove" it when he filed his amended complaint. To substantiate his avowals, Sharifi also submitted unsigned declarations attributed to three Baywood physicians. Although the

declarants each claimed to have heard disparaging remarks about Sharifi, none avowed to have heard such remarks directly from Dinner.

¶43 Having reviewed the record in its entirety, we conclude the superior court's findings are not clearly erroneous. Nothing in the record suggests that Sharifi had any admissible evidence to support his defamation claim against Dinner at the time he filed his amended complaint. Although Sharifi asserts there were "circumstantial reasons for believing" that Dinner had made defamatory statements against him, he admits that only Wilson avowed that she directly overheard such remarks. According to his affidavit, Sharifi relied heavily on Wilson's account, but Wilson did not allegedly overhear Dinner making disparaging remarks *until months after* Sharifi filed his amended complaint, so her account could not serve as the factual predicate for that complaint. Moreover, consistent with the superior court's findings, the record does not reflect that Sharifi made any attempt to depose any of the individuals he asserts witnessed Dinner utter defamatory statements. In asserting that "[t]he only missing element was someone who heard Dinner make the statements," Sharifi fails to recognize that such evidence was the necessary factual predicate for his defamation claim. In other words, unable to offer evidence that someone witnessed Dinner making defamatory statements, Sharifi based his entire defamation claim on supposition and speculation. Therefore, on this record, the superior court did not err in finding Sharifi's claim was groundless and he pursued it in bad faith, and awarding Dinner her attorneys' fees under A.R.S. § 12-349.

## CONCLUSION

¶44 For the foregoing reasons, we affirm. Dinner requests an award of her attorneys' fees under A.R.S. § 12-349. Because Sharifi's defamation claim was groundless and pursued in bad faith, we grant Dinner's request, conditioned upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA