NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MARY VERMEDAHL, et al.,
*Plaintiffs/Appellants/Cross-Appellees*,

*v.*

DANIEL HEATH, et al.,
*Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 25-0281
No. 1 CA-CV 25-0593
(Consolidated)

FILED 06-25-2026

Appeal from the Superior Court in Maricopa County
No.  CV2022-006448
The Honorable Timothy J. Ryan, Judge (Retired)

**REVERSED AND REMANDED**

COUNSEL

Burg Simpson Eldredge Hersh & Jardine PC, Phoenix
By David Kendell TeSelle, Rachel Nicole Denning, and Joshua
Abromovitz
*Plaintiffs/Appellants/Cross-Appellees*

Burg Simpson Eldredge Hersh & Jardine PC, Englewood
By David Dean Batchelder (*Pro Hac Vice*)
*Plaintiffs/Appellants/Cross-Appellees*

Quarles & Brady LLP, Phoenix
By Jimmie W. Pursell, Jr., Daniel J. F. Peabody, Christopher Thomas Shanley
*Defendants/Appellees/Cross-Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Brian Y. Furuya and Judge James B. Morse Jr. joined.

---

**J A C O B S**, Judge:

**¶1** Mary and Walter Vermedahl appeal the superior court's entry of summary judgment against them on their claim that Daniel and Toni Heath sold them a lame horse ("Charlie"), and the court's exclusion of the Vermedahls' experts, who opined about tests performed on Charlie shortly after the Vermedahls bought him. The Heaths appeal the summary judgment against them on their counterclaim that the Vermedahls defamed Daniel.[1] Because the court erred by excluding the Vermedahls' experts, and genuine issues of material fact remain as to all claims, we reverse the summary judgments and remand for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

**A.    The Vermedahls Buy Charlie on January 11, 2022, After Test Rides on January 8 and 9, 2022, and a Prepurchase Examination on the Day of Sale.**

**¶2** The Vermedahls are experienced ropers who wanted to buy a horse suitable for competitive team roping. Daniel breeds and sells Western performance horses. He advertised a horse on Facebook named Legend De Lena, but more commonly known as Charlie, as a "Champion Reined Cow Horse" and a "Roping Head Horse, or Heel Horse." Mary contacted Daniel after seeing his Facebook ad, and Daniel knew Mary intended to use Charlie as a head roping horse.

---

[1] Throughout this matter, Mary and Walter Vermedahl generally proceeded jointly, as did Daniel and Toni Heath. Thus, even though some pleadings and briefs were filed only by one spouse, other than setting out facts that pertain to particular litigants, for ease of reference, we refer to the litigants collectively  as "the Vermedahls" and "the Heaths."

¶3          Before buying Charlie, Mary repeatedly evaluated him.  On January 8, 2022, she went to the Heaths' property.  After seeing Toni ride Charlie there, Mary rode Charlie and roped a mechanical steer while she did so.  Daniel then brought Charlie to the Vermedahls' property on both January 8 and 9 so Mary could continue to rope cattle while mounted on Charlie under live-cattle conditions.  Daniel imposed no time limits or restrictions on Mary's test rides with Charlie.  Mary testified Charlie did not appear lame or feel "off" during these test rides.  After one, Mary texted Daniel that she and Walter "really like[d]" Charlie, and that Charlie was "a real gem."

¶4          Mary agreed to buy Charlie for $50,000, subject to Charlie passing a prepurchase veterinarian examination ("PPE").  Dr. Brian Buchanan performed the PPE the morning of January 11.  Dr. Buchanan observed Charlie jog in hand and in circles, performed flexion testing, and took radiographs of Charlie's legs.  Dr. Buchanan concluded Charlie was "sound baseline," which means "the horse was not exhibiting shortness of stride," though he flexed "a little bit sore" in the front limbs.  Mary was present for this discussion and acknowledged Charlie's soreness, stating it seemed "par for the course" for an eight-year-old rope horse.  Mary then completed the purchase and took Charlie home, also on January 11.

###       B.       Charlie's Condition Arguably Changes After the Sale and Veterinarians Examine Him One and Three Days Later.

¶5          The parties sharply dispute Charlie's condition after the sale.  Mary testified that within hours of bringing Charlie home, "he was starting to elevate on the front end" in a way she described as "extremely dangerous" because if "a horse elevates too high, they can flip over backwards, and you can get killed."  The next day, January 12, Mary warmed Charlie up in her arena and observed behavior she believed indicated pain, including uneven weight distribution, spasming in his front legs and shoulders, reluctance to move comfortably, and lameness in his left front leg when trotting on a loose rein.

¶6          Later that day, worried Charlie might be in pain, Mary took him to her neighbor's home where Dr. Scott Strosnider was treating the neighbor's horses.  Dr. Strosnider conducted a lameness exam on Charlie that day.  Dr. Strosnider found Charlie capable of being ridden, roped from, and worked.  But Dr. Strosnider also observed lameness after flexion, including a noticeable head bob, and identified left-front tendinitis.  Dr. Strosnider later explained a horse may appear sound and workable "until you put it under an issue of stress or load" and "[s]o while he appears to be

sound when you first look at him, until you do your flexions, you don't know if he has a lameness issue."

¶7            That evening, Mary texted Daniel, asking to return Charlie for a refund. Daniel responded that Charlie had always been perfectly healthy and recommended that Mary have Dr. Buchanan examine Charlie again. Daniel later offered to repurchase Charlie for $50,000, subject to a PPE "so that [he] could determine what, if anything, had actually happened to Charlie." Mary declined that offer.

¶8            Mary also contacted Dr. Gary Kaufman, a veterinarian with more than 50 years of experience in equine medicine and surgery, including decades of experience diagnosing equine lameness and administering lidocaine in clinical practice. Dr. Kaufman has administered lidocaine to horses "nearly on a daily basis" during his decades-long equine practice, has administered it "literally thousands of times," and regularly uses it during lameness examinations to isolate pain and determine whether "a lame horse becomes sound." He further explained that, if administered in the proper amount, at the proper site, and within the proper time, lidocaine can allow "a horse that is, in fact, unusably lame" to "gain a full, normal stride and not appear lame."

¶9            Dr. Kaufman examined Charlie on January 14. He observed Charlie was lame and concluded he was not rideable. To evaluate whether Charlie's condition could be attributed to a post-sale injury, Dr. Kaufman recommended both a drug screen through Center for Toxicology Services, Inc. ("CTS") and muscle enzyme testing through DVM Labs, and collected the blood samples himself, also on January 14.

### C.    Blood Testing Three Days After the Sale Shows Lidocaine and Its Metabolite in Charlie's Body.

¶10            Dr. Kaufman submitted the samples to CTS, where Jeanne Mahoney serves as President, Director, and Quality Control Coordinator. Ms. Mahoney has worked in the testing of animal samples for performance-based drugs, therapeutics, and medications since 1982 and has overseen laboratory operations at CTS since 1991. Using an Enzyme Linked Immunosorbant Assays ("ELISA") screening followed by liquid chromatography tandem mass spectrometry ("LC/MS/MS") analysis, CTS detected lidocaine and its metabolite in Charlie's blood.

¶11            At Dr. Kaufman's request, CTS performed a reanalysis to confirm the results. Quantitative testing reported lidocaine at 9.05 µg/ml and its metabolite, 3-Hydroxylidocaine, at 2.55 ng/ml. Neither lidocaine

nor its metabolite occurs naturally in a horse's blood, so the presence of the metabolite indicates prior administration of lidocaine. The concentrations of lidocaine in Charlie exceeded industry thresholds for therapeutic medications, indicating the drug could have had a pharmacological effect and thus masked his lameness.

¶12 DVM Labs administered muscle enzyme testing to evaluate possible muscle cramping or injury. The testing measured two markers in Charlie's blood that would demonstrate, if out of range, muscle stress or injury: his aspartate aminotransferase ("AST") and creatine kinase ("CK") levels. The testing did not reveal muscle enzyme elevations indicative of significant muscle injury or cramping. The results reflected AST levels of 343 and CK levels of 298. Although the results identified the upper end of the normal CK range as 283, making Charlie's CK levels slightly elevated, Dr. Kaufman noted that the elevation was "essentially in the range usually seen in horses being ridden/exercised," whereas CK elevations between 1000 and 3000 would be expected if muscle cramping were present. The results did not identify any abnormal AST findings. Given the absence of muscle enzyme levels suggesting injury or cramping, but the presence of lidocaine and its metabolite, Dr. Kaufman concluded Charlie's lameness was not caused by post-sale muscle injury and instead suggested that lidocaine may have been present during the PPE.

### D. The Vermedahls Sue Over the Sale of Charlie, and the Heaths Counterclaim for Defamation.

¶13 The Vermedahls sued the Heaths for breach of contract, breach of express and implied warranties, fraud, consumer fraud, unjust enrichment, promissory estoppel, aiding and abetting, and community liability. In sum, the Vermedahls claimed the Heaths represented Charlie as sound and suitable for roping despite knowing he was lame or had been treated with lidocaine.

¶14 The Heaths counterclaimed against the Vermedahls for defamation per se. They also alleged tortious interference with business expectancy, but later voluntarily withdrew that claim. The Heaths alleged the Vermedahls told others in the western performance horse community that Daniel had drugged Charlie with lidocaine to conceal lameness. The Heaths alleged those statements harmed Daniel's reputation as a horse breeder and seller.

¶15 Mary admitted making statements about Charlie's condition and the presence of lidocaine in his system to several people, including

Tyler Merrill and Amber Carroll, Mary's daughter. She told Tyler that Charlie was lame and had lidocaine in his blood and that the presence of "drugs in his system" rendered the PPE invalid. These statements circulated within the western performance horse community. For example, at a trade show in Texas in February 2022, a participant approached Toni and stated Amber told her that her mother (Mary) had bought a horse from the Heaths, that the horse was lame, and that the horse had lidocaine in its system. Amber admitted discussing within the community that Charlie was lame and that there were drugs in his system at the time her mother purchased him. These statements entered the community in part as a result of Mary's communications, including her statements to Amber and others that Charlie was lame and had lidocaine in his system.

### E. The Court Grants All Parties' Motions for Summary Judgment and the Heaths' Motion to Exclude the Vermedahls' Experts, Leading to This Appeal.

¶16 The Heaths moved under Arizona Rule of Evidence 702 ("Rule") to exclude the testimony of Dr. Kaufman and Ms. Mahoney concerning the presence of lidocaine in Charlie. Soon thereafter, the Heaths moved for summary judgment on the Vermedahls' claims, arguing that the evidence — particularly Dr. Buchanan's PPE, which noted some soreness but nevertheless found Charlie fit for his intended use — proved that any lameness was not masked by lidocaine, so no genuine dispute of material fact existed.

¶17 Opposing the Heaths' motion, the Vermedahls argued their experts' opinions were supported by laboratory testing, and equine medication detection guidance. They pointed to evidence that, after examining Charlie on January 14, 2022, Dr. Kaufman ordered both a blood drug screen and a muscle enzyme study because he found Charlie's condition unusual. Dr. Kaufman's records stated the blood test revealed "a significant amount of Lidocaine in the blood sample drawn from [Charlie] on 01/14/22," and that the "[l]idocaine presence in his system would make passing the original prepurchase [v]eterinary exam invalid."

¶18 The Vermedahls also relied on laboratory findings from Ms. Mahoney's expert report which showed that Charlie's blood sample contained 9.05 µg/ml of lidocaine and 2.55 ng/ml of 3-Hydroxylidocaine. Ms. Mahoney's report also stated that "[e]xceeding the allowable [t]hresholds would mean that the drug has been determined to have a pharmacological effect on the horse," identified the Racing Medication and Testing Consortium ("RMTC") therapeutic threshold for lidocaine as "0.020

ng/ml of total 3-Hydroxylidocaine in equine plasma or serum," and concluded that Charlie's concentration exceeded that threshold.

¶19 The parties relied on competing equine medication detection guidance materials concerning how long lidocaine and its metabolites may remain detectable in a horse's blood. The Vermedahls relied on guidance suggesting detectability may extend up to seven days, while the Heaths relied on studies and guidance reflecting detection or withdrawal periods of approximately 48 to 72 hours. The Vermedahls relied on the United States Equestrian Federation (USEF) 2022 Guidelines and Rules for Drugs and Medications ("Guidelines"), which are published by the national governing body for equestrian sport in the United States. The USEF Guidelines state that lidocaine may remain detectable in a horse for up to seven days depending on factors such as dosage, route of administration, frequency of administration, and the horse's individual condition. The Vermedahls argued the Guidelines supported Dr. Kaufman's opinion that lidocaine could have remained in Charlie's system at the time of the January 14 blood draw, which occurred three days after the January 11 PPE.

¶20 The Heaths, by contrast, relied on materials published by the RMTC and the Fédération Équestre Internationale ("FEI"). RMTC is an organization that develops medication-control and withdrawal guidance for horse racing and competition industries. The Heaths relied on RMTC's Controlled Therapeutic Medications Monograph Series: Lidocaine ("Study"), which summarized a controlled administration study involving six exercise-conditioned thoroughbred horses that each received a single 200 mg subcutaneous dose of lidocaine. In the Study, concentrations of 3-Hydroxylidocaine fell below the laboratory's limit of quantification in all six horses by 48 hours, though the RMTC guidance nevertheless recommended using 72 hours as the detection or withdrawal period because of the small sample size and potential variability among horses. The RMTC Study further cautioned that increasing the dose, changing the route of administration, combining medications, or differences in horse physiology could alter detectability and render the guidance inapplicable.

¶21 The Heaths also relied on FEI's "List of Detection Times." FEI is an international governing body for equestrian sports that publishes medication-detection guidance for competition horses. The FEI materials indicated lidocaine could be detected approximately 48 hours after subcutaneous administration and noted that detectability varies based on route of administration, dosage, metabolism, health, and other horse-specific circumstances. The FEI materials and RMTC Study referenced by the Heaths were based on single-dose studies involving relatively small

groups of horses. Ms. Mahoney explained FEI is generally stricter because it regulates international competitions and permits lower allowable medication concentrations than the USEF. While the parties relied on different guidance materials, both sets of materials recognized that lidocaine detectability may vary depending on the circumstances of administration and the individual horse.

¶22　　　　The court found both Dr. Kaufman and Ms. Mahoney "qualified in their respective fields" and their opinions "relevant," but concluded that portions of their opinions were speculative and not based on sufficient facts or reliable methods. The court specifically determined that neither expert could reliably opine on the timing, dosage, or number of lidocaine administrations, or perform a retrograde analysis. For those reasons, the court excluded their testimonies in full. It simultaneously granted summary judgment against Mary on all of her claims and denied the Heaths' subsequent request for attorneys' fees and costs as to those claims. Mary moved the court for reconsideration, which the court denied.

¶23　　　　The Vermedahls also moved for summary judgment on the Heaths' defamation per se counterclaim, which the superior court granted. The court found that: "[n]o evidence exists" that the Vermedahls made defamatory statements; allegations contained in a filed complaint cannot constitute defamation; and there was "no evidence of damages." The court also disposed of other claims not at issue in this appeal.

¶24　　　　The Vermedahls appeal the order precluding their' expert testimony, granting the Heaths summary judgment on their claims, and denying their motion for reconsideration. The Heaths cross-appeal from the summary judgment on their defamation per se counterclaim against the Vermedahls, and the denial of his request for attorneys' fees and costs as to the Vermedahls' claims. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. § 12-2101(A)(1).

### DISCUSSION

I.　**The Superior Court Erred By Excluding Dr. Kaufman's and Ms. Mahoney's Testimony Altogether Rather Than Limiting It.**

　　　A.　**The Superior Court Is the Gatekeeper of What Expert Evidence Is Reliable, But Gatekeeping Does Not Replace the Adversary System.**

¶25　　　　We review a ruling excluding expert testimony under Arizona Rule of Evidence 702 for abuse of discretion. *See State v. Bernstein*,

237 Ariz. 226, 228 ¶ 9 (2015). An error in the application of Rule 702 is necessarily an abuse of discretion. *Id.* at 230 ¶ 19. Rule 702 makes expert testimony admissible if the witness is qualified, their testimony will assist the trier of fact, and the testimony is based on sufficient facts and reliable principles and methods reliably applied to the case. Ariz. R. Evid. 702(a)-(d). The superior court is a gatekeeper that excludes unreliable or speculative opinions, but it cannot exclude wholesale otherwise admissible testimony. *See State v. Romero*, 239 Ariz. 6, 9-10 ¶¶ 14-16 (2016) (reversing exclusion of admissible testimony of experimental design expert who was barred from testifying on firearms identification, an area in which the expert was not offered). As the Comment to Rule 702 reminds us, "[t]he trial court's gatekeeping function is not intended to replace the adversary system. Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Ariz. R. Evid. 702, cmt. to 2012 Amendment.

### B. The Court Excluded Relevant, Admissible Opinions That Were Sufficiently Reliable to Reach the Trier of Fact.

**¶26** We affirm the superior court's initial finding that both Dr. Kaufman and Ms. Mahoney are "qualified in their respective fields." The record supports their qualifications, and we see no abuse of discretion in finding them qualified. We also affirm the superior court's finding that their opinions are "relevant." Whether Charlie had a significant amount of lidocaine in his system on January 14 is relevant. There is record evidence lidocaine can stay in a horse's system for seven days. If the jury believes the Vermedahls, then Charlie may have had lidocaine in his system when she bought him, which supports her claims. Or the jury may believe the Heaths didn't administer the lidocaine, thus suggesting the Vermedahls did. Either way, laboratory testing about Charlie's condition on January 14, and the interpretation of it, is relevant.

**¶27** It was thus error to strike the entirety of the experts' opinions on the ground that it would be "speculati[ve]" for them to opine on when and how much lidocaine was administered to Charlie, including by retrograde analysis. Why? Their opinions were far more nuanced than that, making them admissible for at least four reasons.

**¶28** *First*, Ms. Mahoney's toxicology testimony wasn't speculative. She performed laboratory testing using ELISA "for a variety of drugs, including lidocaine" and confirmed the results using LC/MS/MS analysis, determining that Charlie's blood contained lidocaine at 9.05

µg/ml and its metabolite, 3-Hydroxylidocaine, at 2.55 ng/ml. Her testimony explained how those tests work, what substances were detected, and the measured concentrations — matters beyond the knowledge of a lay jury. She offered testimony that these substances are not naturally occurring, that their presence necessarily indicates administration of lidocaine, and that the concentrations exceeded accepted thresholds in the horse racing and show industries, meaning they could have had a pharmacological effect. None of this relevant testimony depends on speculation about timing or dosage. Excluding it was error.

¶29　　　*Second*, both experts helpfully explain the scientific and medical significance of those results. Like Ms. Mahoney, Dr. Kaufman testified that the levels of lidocaine and its metabolite were "abnormally high" and not consistent with normal or incidental exposure. He further explained that lidocaine is commonly used to numb areas of pain and can mask lameness by reducing observable symptoms. This testimony bears directly on the central issue of whether Charlie may have appeared sound during the PPE because his symptoms were temporarily suppressed.

¶30　　　*Third*, Dr. Kaufman's clinical observations were likewise admissible. He examined Charlie shortly after the PPE and found him lame and "not a rideable horse." He also ordered muscle enzyme testing which came back normal, ruling out post-sale injury or muscle cramping "that would show up as a severe lameness." These observations explain the need for testing and its context and provide a factual basis to evaluate whether Charlie's condition reflected a preexisting issue rather than a new injury.

¶31　　　*Fourth*, the experts' testimony would assist the jury in contextualizing the PPE findings and subsequent examinations. The PPE noted some degree of soreness on flexion, while later examinations revealed lameness. Expert testimony could assist the jury in determining whether that progression was medically consistent with a newly developed condition or was instead indicative of a condition that existed but was not fully observable at the time of sale.

¶32　　　These categories of testimony were grounded in laboratory testing, veterinary examination, and established medical principles. They were not the speculative opinions the superior court excluded about when and how much lidocaine was administered to Charlie. Rule 702 does not permit exclusion of an expert's entire testimony simply because some opinions are inadmissible. *See Romero*, 239 Ariz. at 10 ¶ 16 (explaining that inquiry focuses on the scope of proffered testimony and whether it will assist the jury). By failing to distinguish between speculative opinions and

admissible, relevant, fact-based testimony that would assist the trier of fact, the superior court exceeded its gatekeeping role. Accordingly, the court erred by excluding the testimony of Dr. Kaufman and Ms. Mahoney altogether. *See* Ariz. R. Evid. 702, cmt. to 2012 Amendment; *Bernstein*, 237 Ariz. at 228 ¶ 9.

## II. The Superior Court Erred by Entering Summary Judgment on Both Parties' Claims Because Genuine Issues of Fact Remain.

**¶33** We review summary judgments *de novo*, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party. *Takieh v. O'Meara*, 252 Ariz. 51, 56 ¶ 11 (App. 2021). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). If reasonable jurors could draw competing inferences from the record, summary judgment is error. *Orme Sch. v. Reeves*, 166 Ariz. 301, 306 (1990). We agree with the Heaths that the Vermedahls' claims are all "premised on the assertion that Charlie was unsound at the time of the purchase." We thus treat the soundness of the summary judgment against them as one proposition that stands or falls on whether there are material issues of fact as to that critical premise.

### A. We Decline to Reverse the Summary Judgment on the Vermedahls' Claims Because of the Brevity of the Superior Court's Order.

**¶34** As a preliminary matter, we reject the Vermedahls' argument that we must reverse the superior court's grant of summary judgment to the Heaths on their claims because the court's explanation was inadequate and fell short of the bar set by Rule 56(a). *See* Ariz. R. Civ. P. 56(a) (court "should state on the record the reasons for granting or denying the motion"). We agree with the Vermedahls that the superior court's single paragraph of written analysis striking their experts followed by one sentence granting summary judgment on all of their claims without further analysis, standing alone, is inadequate. *See id.* We also note that the oral argument transcript doesn't contain a more fulsome explanation. We likewise agree this matters, because the superior court's careful analysis is very helpful even in a *de novo* review of its decision, and also to the parties in framing the issues for appellate courts. But as we explain next, we reverse for the more important reason that there are genuine issues of material fact as to whether Charlie was unsound on January 11, 2022. *See id.*

### B. The Record Reflects Genuine Disputes of Material Fact as to Charlie's Condition.

¶35        The Heaths argue summary judgment on the Vermedahls' claims was proper, claiming undisputed evidence shows Charlie was sound when purchased.  They rely on Dr. Buchanan's PPE, which found Charlie "sound" when jogging, though "a little sore" on flexion, and on the Vermedahls' acknowledgment that such soreness was "par for the course." They argue the presence of soreness during the PPE undermines any inference that Charlie's lameness was concealed, arguing that if lidocaine had been administered to him, it would have masked such symptoms.  The Vermedahls argue the medical and observational evidence supports a competing inference that Charlie was not sound at the time of sale.  We agree the evidence presents a genuine dispute of material fact.

¶36        The experts' opinions, standing alone, are enough to send this case to the jury.  The jury will now hear Charlie's January 14 blood draw revealed lidocaine and its metabolite at levels Ms. Mahoney described as more than 100 times the RMTC threshold concentration.  The central dispute is whether lidocaine administered before the January 11 PPE could still have been detectable when Dr. Kaufman drew Charlie's blood on January 14.  The Heaths rely heavily on RMTC and FEI materials to argue that lidocaine is not detectable 48-72 hours after administration.  But the RMTC Study itself cautions that detectability may vary depending on the "dose or doses administered, the frequency of administration, the route or routes of administration," horse physiology, and other circumstances.

¶37        The Vermedahls rely on USEF Guidelines stating that lidocaine may remain detectable for up to seven days.  At oral argument the Heaths argued the USEF Guidelines were not scientific evidence regarding lidocaine metabolism and instead merely established competition rules.  Despite that, the USEF Guidelines are clear.  They are headed "HOW LONG DRUGS REMAIN DETECTABLE," and below that capitalized heading, they ascribe to "local anesthetics other than procaine, e.g., lidocaine" a period of "7 days" within which they remain detectable. The Heaths are free to argue to a jury that this guideline isn't reliable.  But the Heaths' say-so that it isn't scientific evidence doesn't make the USEF guideline fall below the bar of "shaky but admissible evidence" enshrined in the comment to Rule 702.  Ariz. R. Evid. 702, cmt. to 2012 Amendment. The Heaths are free to pursue the traditional attacks on such evidence, which are "[c]ross-examination, presentation of contrary evidence, and [urging] careful instruction on the burden of proof." *See id.*  Choosing between the Vermedahls' and the Heaths' theories as to lidocaine is for the

jury, not for the superior court on summary judgment (or this court on review of its ruling). *See Orme Sch.*, 166 Ariz. at 310 ("[S]ummary judgment should not be used as a substitute for jury trials simply because the trial judge may believe the moving party *will* probably win the jury's verdict.").

¶38 Other evidence about whether Charlie was lame is also sufficiently in conflict to allow a jury to side with either the Vermedahls or the Heaths. The Heaths argue Dr. Strosnider found Charlie capable of being worked and in condition comparable to or better than the PPE. But while Charlie appeared sound during test rides and the PPE, the Vermedahls presented evidence he exhibited rapid and abnormal deterioration within hours after purchase, including uneven weight distribution, spasms, and lameness. They also note that Dr. Strosnider observed lameness, including a higher flexion score and a noticeable head bob when jogging. He also identified left front tendinitis, "a condition that had not previously been disclosed to the Vermedahls," and acknowledged the possibility of a chronic or preexisting condition that "popped itself back up after being ridden." The Vermedahls argue these sudden changes permit a reasonable inference that Charlie's condition at the time of sale was not as represented.

¶39 These many conflicts within the evidence, and the competing inferences they might support, reinforce that this dispute requires a determination of the Vermedahls' claims by a trier of fact. *See Orme Sch.*, 166 Ariz. at 310. Because we reverse the dismissal of the Vermedahls' claims in light of those conflicts, we do not reach the Heaths' arguments that the court erred by not also awarding them attorneys' fees under A.R.S. § 12-341.01.

### C. The Superior Court Erred by Granting Summary Judgment on the Heaths' Defamation Per Se Counterclaim.

¶40 The Heaths argue the court erred by granting the Vermedahls summary judgment on their defamation per se counterclaim because the record contains evidence that Mary published statements to multiple third parties that Charlie was lame, had lidocaine or "drugs" in his system, and that lidocaine was in Charlie's system at the time of the PPE. The Vermedahls respond that, even if the claim constitutes defamation per se, the Heaths were still required to show injury. The Heaths are correct on each disputed point.

¶41 A defamation claim requires a false and defamatory statement concerning another, publication to a third party, and the requisite

fault. *Dube v. Likins*, 216 Ariz. 406, 417 ¶¶ 35-36 (App. 2007). A statement is defamatory if it tends to bring a person into "disrepute, contempt, or ridicule," or impeaches the person's "honesty, integrity, virtue, or reputation." *Id.* at 418 ¶ 43 (quotation omitted). A statement is defamatory per se when it tends to injure a person in his trade, business, or profession. *Green Acres Tr. v. London*, 142 Ariz. 12, 22 (App. 1983), *aff'd in part, vacated in part*, 141 Ariz. 609 (1984). In such cases, damages are presumed and need not be proven. *Id.* When the subject matter is defamatory per se, "the injury to the appellant [is] presumed without proof of special damages," and the plaintiff need only present evidence that the matter was communicated to a third party. *McClinton v. Rice*, 76 Ariz. 358, 365 (1953). The Vermedahls' argument that the Heaths had to affirmatively prove injury conflicts with settled law.

¶42 The superior court found "[n]o evidence" that the Vermedahls made defamatory statements to third parties. The Heaths argue that finding cannot be reconciled with the record, emphasizing that Mary admitted in discovery and deposition that she communicated statements about Charlie's alleged lameness and drugging to Tyler, Amber, and numerous others. Viewed in favor of the Heaths, that evidence is sufficient to establish publication for purposes of surviving summary judgment. Mary does not meaningfully dispute that she made statements to Tyler and Amber, but argues those statements were limited to assertions that Charlie was lame and had lidocaine in his system — facts she contends were substantially true based on post-sale veterinary findings and toxicology results. The Heaths respond that the import of these statements went further than what Mary claims and suggested that: Charlie had lidocaine in his system at the time of the PPE; the PPE was invalid; and Daniel or someone acting for him administered drugs to conceal lameness.

¶43 The distinction that the Heaths draw is material. The record supports that Mary told Tyler that Charlie was lame and had lidocaine in his blood and that she sought Tyler's involvement because there were "drugs in [Charlie's] system." The Heaths also point to evidence that Mary told Amber the blood test showed Charlie had been given lidocaine on multiple occasions. A reasonable jury could interpret these statements as implying the Heaths sold a drugged or misrepresented horse — an assertion capable of harming Daniel in his trade as a breeder and seller. We agree that this evidence creates a triable issue as to defamatory meaning and publication.

¶44 The Vermedahls claim Mary's statements were not defamatory because they were conditionally privileged given that she

14

contacted Tyler in an effort to resolve the dispute. The Heaths respond that any such privilege was lost because Mary repeated similar statements to individuals, including Amber, who were not involved in resolving the dispute, and the allegations are not based on the Vermedahls' complaint. Even if a conditional privilege initially applied, whether that privilege ceased to exist is a fact-intensive question that can't be resolved as a matter of law on this record.

¶45        Nor does the absence of evidence of specific economic harm support summary judgment. Because the alleged statements concern Daniel's trade, they are actionable as defamation per se if proven, and no showing of special damages or independent proof of injury is required. *Green Acres*, 142 Ariz. at 22; *McClinton*, 76 Ariz. at 365.

¶46        The Vermedahls' arguments that Mary's statements were true, privileged, or not "of and concerning" the Heaths may ultimately persuade a jury. But the record, viewed in the light most favorable to the Heaths' claims, contains evidence of publication to third parties who knew the Heaths were the sellers and of statements capable of defamatory meaning in their trade. The superior court thus erred by granting summary judgment on the Heaths' defamation per se counterclaim. *Takieh*, 252 Ariz. at 56 ¶ 11.

## CONCLUSION

¶47        We reverse the superior court's entry of summary judgment on both the Vermedahls' claims and the Heaths' claims. We also reverse the superior court's exclusion of Dr. Kaufman's and Ms. Mahoney's testimony for the reasons stated and remand this case to the superior court for further proceedings consistent with this decision. Given our decision, we deny the Heaths' request for attorneys' fees and costs under A.R.S. §§ 12-341 and 12-341.01, and ARCAP 21.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:            JR